218 N.J. Super. 177 (1987)
527 A.2d 84
JERSEY CITY EDUCATION ASSOCIATION INC., PLAINTIFF-RESPONDENT,
v.
BOARD OF EDUCATION OF THE CITY OF JERSEY CITY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 27, 1987.
Decided May 27, 1987.
*179 Before Judges J.H. COLEMAN, R.S. COHEN and GRUCCIO.
William A. Massa, attorney for appellant (William C. Gerrity on the brief).
Feintuch & Porwich, attorneys for respondent (Alan S. Porwich of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., J.A.D.
The significant question raised by this appeal is whether an affirmative action plan for promotion is violative of a Collective Negotiation Agreement.
On May 7, 1982 plaintiff Jersey City Education Association (Association) filed a request to arbitrate whether defendant Jersey City Board of Education (Board) violated the parties' Collective Negotiation Agreement's (Agreement) promotion and hiring policy. The Administrators and Supervisors Association (ASA) joined plaintiff in these proceedings but elected to withdraw before final decision. Stanley L. Aiges was selected as the arbitrator and a hearing was held on August 16, 1982. On August 27, 1982 Aiges decided in plaintiff's favor, retaining jurisdiction to insure compliance. Apparently, unbeknownst to the arbitrator the Public Employment Relations Commissions *180 (PERC) in 1981 and May 1982 had declared void several clauses in the Agreement which were involved in the arbitrator's decision. The arbitrator's decision was confirmed by the Chancery Division and later vacated on January 25, 1985 when PERC's decisions were brought to the court's attention. The matter was then remanded to the arbitrator to conduct additional hearings in light of PERC's decisions.
The arbitrator conducted a new hearing on April 23, 1985. He rendered his decision on July 22, 1985. Additional hearings were held on October 21, 1985, and January 4, 1986 to determine whether additional promotions and procedures were violative of the Agreement. The arbitrator found that certain post-1982 promotions violated the Agreement. He directed that the persons filling those positions be removed.[1] Upon plaintiff's complaint and over the Board's opposition, the arbitrator's final decision was confirmed by order of the Chancery Division dated July 15, 1986. Defendant has appealed. We now reverse in part and affirm in part.

PROCEDURAL AND FACTUAL BACKGROUND
The relevant facts are not disputed. The controlling Agreement provides in Article 16:
16-1. The administrative and supervisory positions listed below shall be filled by Board appointment, in order of numerical ranking from appropriate eligibility lists.
16-1.1 Numerical ranking shall be determined through competitive examinations conducted by the Board of Personnel Practices. The examinations shall consist of a written section which shall have a weight of 40%. No person shall be allowed to take the oral section of the examination unless he has passed the written part. The oral interview shall have a weight of 60%. The Board of Personnel Practices conducting the oral interview shall include professional educators not regularly employed by the Board of Education.

*181 16-2. The positions of Superintendent of Schools, First Assistant Superintendent of Schools and Assistant Superintendent of Schools are not within the scope of this promotional policy.
16-3. Positions covered by the policy are as follows:
Director, High School Principal, Assistant Director, Grammar School Principal, High School Vice Principal, Supervisor, Primary Principal, Grammar School Assistant Principal, and Assistant Supervisor.
16-4. It is agreed that, in administering this policy:
Vacancies to be filled shall be publicized in all schools within ten (10) school days after an opening occurs.
16-5. All publicity and notices of such vacancies and positions shall set forth qualifications for and duties of the positions.
16-6. Promotional examinations shall be held within sixty (60) days following said announcement. Any necessary extension of this period shall be made by mutual agreement between the Office of the Superintendent of Schools and the Association.
16-7. Vacancies arising may be filled on a temporary basis until they can be filled in accordance with the provisions of Section 4, 5 and 6 of this Article.
16-8. All vacancies and positions shall be filled without regard to race, age, creed, color, religion, nationality, sex or marital status.
When the arbitrator rendered his first decision on August 27, 1982, PERC had already declared the subjects covered in sections 16-1.1, 16.2, 16.3 and 16.7 involved to be nonarbitrable. PERC held that the other subsections of Article 16 were procedural in nature and therefore subject to arbitration. The arbitrator concluded that the Board violated the Agreement by failing to fill certain promotional positions between March 1982 and mid-August 1982 from a numerical ranking list which was to have been created pursuant to Article 16-1.1.
Pursuant to the arbitrator's directive, on March 19, 1983, the Board posted notices of vacancies for positions which occurred subsequent to mid-August 1982. The Board arranged to have written examinations conducted by the Educational Testing Service (ETS). Oral examinations were also conducted. ETS would not compile a rank order list without verification of the validity of the tests. Because the Board declined to comply with that request, it retained the services of Dr. Douglas A. Penfield, a statistician from Rutgers University, to compile a rank order list. At the direction of the Board, he weighed the oral and written examinations 60%-40% respectively. The resulting *182 list, which became known as the "Penfield List," was submitted to the court on July 30, 1984 by the Board in connection with contempt proceedings. The list contained 262 names for the seven posted positions.
Documents submitted to the court by the Board on September 5, 1984 for a September 12, 1984 contempt hearing informed the court for the first time that PERC had determined that certain sections of the Agreement were not subject to mandatory negotiations, and hence nonarbitrable, because those invalidated clauses were unduly restrictive of management prerogative. See In re IFPTE Local 195 v. State, 88 N.J. 393, 403-404 (1982). Based on the PERC decisions, the judge vacated his prior order confirming the arbitrator's decision.
The arbitrator conducted a new hearing on April 24, 1985 and rendered his decision on July 22, 1985. He found that the two PERC decisions did not affect the result he reached on August 27, 1982. He concluded that those aspects of the Agreement struck down by the PERC decisions left unaffected the essential aspects of his decision. Since he had retained jurisdiction, Aiges conferred with the parties on August 6, 1985 to deal with the change in legal status of those people allegedly promoted improperly between March and mid-August 1982. It was agreed that it would be impossible to set aside the promotions originally in dispute because during the intervening time the promoted individuals had acquired tenure or otherwise removed for other reasons.
However, the Association and the ASA contended that certain promotions made during 1984 and 1985 also violated the (1) Agreement, (2) 1982 arbitrator's decision which had been confirmed, and (3) July 22, 1985 arbitrator's decision. The parties agreed to present the post-1982 promotions to Aiges for decision. Two formal statements of grievance were filed. Grievance # 1 alleged that certain promotions violated the "Penfield List." Grievance # 2 contended that promotions made from interviews only where no list was made violated the procedural *183 requirements that promotions be made from a rank order list. The Association and the ASA alleged that 19 positions were filled by promotional appointments in August and December 1984. On September 9, 1985, the grievances were amended to include a second list of 19 other promotions alleged to have been improperly filled and on September 12, 1985, 6 other positions were added to the grievance list.
On October 21, 1985 the first hearing was held after the August 6, 1985 conference. During that hearing Arbitrator Aiges directed that persons whose positions were in dispute were entitled to appear as interested parties. An additional hearing was conducted on December 11, 1985. During these rehearings the ASA elected to withdraw from the case. A final hearing took place on January 4, 1986 and on March 24, 1986 Arbitrator Aiges rendered a decision in favor of plaintiff finding that the post-1982 appointments were made contrary to the Agreement and ordered that the positions be vacated promptly. He retained jurisdiction to insure compliance.
The arbitrator found that the promotions were not made from a valid list. As we previously mentioned, the "Penfield List" was compiled pursuant to the 1982 arbitrator's decision which was submitted to the court on July 30, 1984. At the time that list was compiled Dr. Ross was the Superintendent of Schools. He was replaced by Dr. Przystup in June 1984 as the Interim Superintendent. The post-1982 promotions were made based on recommendations of Dr. Przystup from a source other than the "Penfield List." Dr. Przystup recommended to the Board in August 1984 that the Board not follow the Penfield List and that the Board abolish the written and oral examinations and select a committee of three administrators and three supervisors to interview all of the candidates for the promotional vacancies. Under his plan the committee would select three applicants and the names would be submitted to Przystup for further interviews. Przystup would then select one person for each position and submit his nominees to the Board. The Board rejected Przystup's plan. However, he submitted another plan *184 to the Board on August 9, 1984 which it adopted the same month.
Under this new plan, Przystup apparently wanted to implement an action plan. He took the Penfield List and established a "mid-point cut-off for each category. (That is, if 20 names were on a list, he ignored those with the 10 lowest aggregate scores.) Second, he placed the remaining candidates on each list into three groups: (1) Hispanics; (2) Blacks; and (3) all others. Third, he created a new ranking list by selecting Hispanics as his first choice and Blacks as his second choice regardless of either group's original ranking on the Penfield List, and by selecting any others as his third choice in order of their appearance on the Penfield List. He also had his staff review each individual's file folder. This list became known as the "Przystup List." Persons promoted from this list have been identified by the Association as those involved in Grievance # 1.
The Przystup List, which was rank ordered, contained eight candidates for the position of elementary principal, eight for elementary assistant principal, five for high school principal, six for high school vice principal, eight for language arts supervisor, eight for elementary supervisory, and five for mathematics supervisor.
The Board adopted the Przystup List on August 29, 1984. It then adopted another resolution that day which promoted 16 of the individuals on the Przystup List. Four of the persons on the August 29, 1984 promotion list are Hispanic, six are Black and six fall into the category of "all others."
On January 22, 1985 the Board promoted two of the persons on the Przystup list to high school principal (one of whom had been promoted on August 29, 1984 to vice principal) and one to high school vice principal. Two of these persons are Black and one is in the category "all others."
On February 20, 1985 the Board promoted one of the persons on the Przystup List to mathematics supervisor and another to *185 assistant principal. These persons are in the category of "all others."
In addition to promoting people on the Przystup List, the Board promoted people who never appeared on any list. This group of people formed the basis for Grievance # 2. People from this group were promoted solely on the basis of interviews conducted by various members of the school administration without creating any rank order list. This procedure of interviews and no rank order list was apparently consistent with the first plan submitted to the Board in August 1984 by Dr. Przystup which it rejected.
The issue before the arbitrator was whether post-1982 appointments violated Article 16 of the Agreement as modified by the PERC decisions. The Board contended the promotions did not, and that the promotions were in furtherance of its affirmative action policy. The arbitrator rejected both of the Board's contentions.
The arbitrator found that the Penfield List had been submitted by the Board to the court during contempt hearings and that it was approved by the court to meet the requirements of Article 16. He found that the Penfield List was the type that applicants were notified would be used. He therefore found it was the only valid list. He also found that the applicants had a right to expect that hiring would be done in order of numerical ranking pursuant to that list. To the extent that the appointments did not follow the Penfield List, but instead followed the Przystup's List, they were found to violate the Agreement.
The arbitrator rejected defendant's affirmative action claim because of the language in Article 16-8 stating that vacancies "shall be filled without regard to race." The arbitrator noted further that there was insubstantial evidence to support the conclusion that defendant was under any government mandate to employ an affirmative action plan. He found that the plan was the personal creation of Dr. Przystup, and would not withstand strict scrutiny. The arbitrator concluded that Dr. *186 Przystup's actions were arbitrary, in violation of the contract, and that the appointments made as a result had to be vacated. He also found that the promotions made solely on the basis of oral interviews were in violation of Article 16-1 as they were made without the use of any list whatsoever. Thus, they could not have been made "in order of numerical ranking ... from an ... appropriate list."
The Association filed a complaint for confirmation of the arbitration award pursuant to N.J.S.A. 2A:24-7. The Board filed an answer, affirmative defenses and counterclaim to vacate the award pursuant to N.J.S.A. 2A:24-8. Oral argument was held on June 26, 1986. During this hearing the judge made clear that he never validated the Penfield List, as only the arbitrator, and not the judge, had the power to do so. At that hearing, the Association conceded that the Board had every right to implement a valid affirmative action plan. The Board conceded that no affirmative action plan was being pursued when the 1982 promotions were made, but insisted that it had an affirmative action policy in effect since 1976, a policy that was implemented in the 1984 and 1985 promotions.
On July 8, 1986 the judge issued a letter opinion confirming the arbitration award, and on July 15, 1986 entered judgment against defendant in favor of plaintiff. The court found that the arbitrator's award was well supported by the facts of the case and by the law of the State. The judge also found that although the goal of affirmative action is laudable, "the procedural irregularities and the manner in which the Board endeavored to achieve this objective in this instance cannot be sustained." He found that the "eleventh hour" adoption of the "affirmative action" plan was factually and legally flawed. He ruled that each of the persons involved in Grievance # 1 and # 2 be removed by July 18, 1986. The Board has appealed.

CONTROLLING LAW
The Chancery Division was required to confirm the decision of the arbitrator unless the Board's counterclaim had *187 merit. N.J.S.A. 2A:24-7. The Board contends essentially that the arbitrator's decision was procured by undue means, that he exceeded the scope of his powers and that his award should be vacated pursuant to N.J.S.A. 2A:24-8(a) and (d). The arbitrator's award is entitled to a presumption of validity and the party opposing confirmation had the burden of establishing that the award should be vacated pursuant to N.J.S.A. 2A:24-8. Johowern Corp. v. Affiliated Interior Designers, 187 N.J. Super. 195, 199 (App.Div. 1982); Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 160 N.J. Super. 559, 565 (Law Div. 1978), aff'd 172 N.J. Super. 186 (App.Div. 1980), aff'd 86 N.J. 179 (1981); Kearny PBA Local # 21 v. Kearny, 159 N.J. Super. 402, 406 (App.Div. 1978), mod. on other grounds 81 N.J. 208 (1979). The scope of our review of the arbitrator's award "is to determine whether the arbitrator followed the inherent guidelines applicable to public sector arbitration and whether the interpretation of the contractual language is reasonably debatable." State v. State Troopers Frat. Assn, 91 N.J. 464, 469 (1982). The arbitrator's award may be vacated only on "the narrow grounds of arbitrator partiality or corruption, fraud, undue means, conduct prejudicial to the rights of a party or failure to make a `mutual, final and definite award,' N.J.S.A. 2A:24-8, or `evident' mistakes by the arbitrators, N.J.S.A. 2A:24-9." Barcon Associates v. Tri-County Asphalt Corp., 86 N.J. 179, 188 (1981). A reviewing court may consider evidence extrinsic to the award to decide whether any of the statutory grounds for vacating the award exists. Kearny PBA Local # 21, supra, 81 N.J. at 219-220.
Matters which may be submitted to binding arbitration in the public sector have been narrowly circumscribed. Prerogatives of management which include governmental policy making cannot be bargained away to be determined by an arbitrator. Kearny PBA Local # 21, supra, 81 N.J. at 215. The decision to promote or to hire is such a managerial prerogative. Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n, 94 N.J. 9, 16 (1983). We are of the view that implementation of an *188 established affirmative action plan is a proper exercise of a managerial prerogative and the Association now concedes this.
The Board's counterclaim sought to vacate the arbitrator's award based on alleged undue means. Undue means was explained in Held v. Comfort Bus Line, Inc., 136 N.J.L. 640, 641-642 (Sup.Ct. 1948) as follows:
The phrase `undue means' comprehends two other distinct classes of cases  i.e., (1) where the arbitrator meant to decide according to law, and clearly had mistaken the legal rule, and the mistake appears on the face of the award or by the statement of the arbitrator; and (2) where the arbitrator has mistaken a fact, and the mistake is apparent on the face of the award itself, or is admitted by the arbitrator himself.
See also Brooks v. Pa. Manu. Assoc. Ins. Co., 121 N.J. Super. 51, 54-55 (App.Div. 1972), aff'd as modified 62 N.J. 583 (1973).
In the public sector, unlike the private sector, public policy demands that the arbitrator follow the law and consider the public's interest and welfare. Communications Workers v. Monmouth Co. Bd., 96 N.J. 442, 450-451 (1984); Kearny PBA Local # 21, supra, 81 N.J. at 217. Thus the arbitrator's failure to follow the substantive law may constitute undue means and require the award to be vacated under N.J.S.A. 2A:24-8(a). Communications Workers v. Monmouth Co. Bd., supra, 96 N.J. at 448.
Finally, Law & Pub. Saf. Dep't v. State Troopers, etc., 179 N.J. Super. 80 (App.Div. 1981) held that the criteria for promotions by a public employer are not arbitrable but procedures for promotions are arbitrable.

DETERMINATION
Here, the Board contends that the arbitrator required it to promote from the "Penfield List" and that exceeded the scope of his authority and constitutes undue means. The Association argues that the arbitrator only decided that the Dr. Przystup list was not valid under Article 16-1 of the Agreement. The Association also argues that the arbitrator decided properly that the Board violated Article 16-1 by making appointments in *189 a manner other than by rank order established by the Penfield List.
After PERC struck down 16-1.1 in 1981, the Board was free to unilaterally establish its own criteria for promotion. State Law & Pub. Saf. Dep't, supra, 179 N.J. Super. at 91-92. The arbitrator concluded that the Board was required to comply with the notice provision of the Agreement. He found that the notice posted by the Board did not inform the applicants that affirmative action criteria would be used in computing the rank order. As part of his reasoning the arbitrator stated that the Penfield List was the kind of list the applicants had come to expect based on the posted notice. He concluded that in the circumstances, the Penfield List was the only list that could be used for the promotions because only it complied with the notice requirement.
The crucial facts which the arbitrator relied upon to support his conclusion that the Penfield List was the only list that could be considered do not exist. First, the arbitrator found that the Penfield List was approved by the Chancery Division Judge in the original confirmation order. Specifically, he stated that "Judge [X] approved it. In doing so, he necessarily concluded that the Penfield list was valid. It follows that it must be deemed to qualify as an `appropriate eligibility list.'" During the second confirmation hearing the judge explicitly rejected the contention that he approved the list. To the extent that this entered into the arbitrator's decision, the decision was erroneous. Moreover, Dr. Przystup used the Penfield List in creating his own list. Using his affirmative action criteria, he made a rank order list for each position. His rank order list contained between five and eight persons for each position. Hence, we find it was not reasonably debatable whether the Przystup List satisfied the procedural requirement of 16-1 of creating a rank order list.
Second, the arbitrator stated that the notice failed to state that affirmative action would be factored into the promotion *190 criteria. He reasoned that any affirmative action criterion would violate Article 16-8, erroneously referred to by him as 16-5. He then interpreted 16-8 as prohibiting affirmative action considerations in promotions and he interpreted the notice to comply with his interpretation of 16-8. He was wrong both factually and legally.
Factually, the first sentence in the notice provided "The Jersey City Board of Education is an Equal Opportunity and Affirmative Action Employer." (Emphasis added). Under the heading on the notice designated to as "Part I, General Requirements," paragraph 10 provided: "The Board of Education will consider assignments to these promotional positions in accordance with its Affirmative Action Plan and State and Federal mandates." (Emphasis added). It is therefore clear beyond debate that the notice stated that the Board had an affirmative action plan and that it would follow that plan in making the promotions.
In addition, the arbitrator found there was no affirmative action plan being implemented and the trial judge agreed. Both clearly overlooked the evidence contained in the Board's appendix. The Board has submitted empirical evidence of under-representation of Hispanics and Blacks proportionate to the student population in the Jersey City School District. Documents contained in the Board's appendix include a Resolution of the Board dated October 13, 1976 which found under-representation of minorities and females and resolved to "attempt to hire on a fifty-fifty minority-majority basis until such time as Affirmative Action goals are met." The resolution directed the Board's staff to use whatever means necessary to "insure the selective appointment of qualified staff...."
Also submitted was the "Affirmative Action Plan in School and Classroom Practices and Employment/Contract Practices for the Jersey City Board of Education 1979-1980" which found that affirmative action was necessary to bring about equal educational and employment opportunity. Statistical tables *191 based on the New Jersey Division of Planning and Research Jersey City Field Office, the State of New Jersey, Department of Civil Service, Office of Equal Educational Opportunity, and New Jersey Department of Labor and Information show the following statistical breakdown of personnel, by job categories, race, ethnicity and sex:

 WHITE BLACK HISPANIC OTHER FEMALES
Full Time Administrators
and Supervisors 78% 20% 2% 0 37.1%
Teachers 69% 25% 5% 1% 69 %
Other Professionals
(Includes Counselors,
Social Workers, L.D.
Specialists, Etc.) 89% 10% 1% 0 56.2%
Paraprofessionals
(Community Aides and
Teacher Aides) 27% 59% 13% 1% 99 %
Clericals 57% 40% 3% 0 97 %
Service/Maintenance 59% 37% 4% 0 71 %
Security 42% 52% 6% 0 64 %
District Summary
(All Job Categories) 62% 32% 6% 0 71.6%
 Jersey City Population (16 years of age and over) with breakdown by race:
 White .................. 74% .................... 143,124 est.
 Black .................. 20% .................... 38,516 est.
 Hispanic ............... 5.7% .................... 10,694 est.
 Other .................. .3% .................... 1,000 est.
 1978-1979 Public School pupil population by race and ethnicity:
 White .................. 22.7%
 Black .................. 49.2%
 Hispanic ............... 25.5%
 Other .................. 2.6%

The statistical analysis found "underutilization of Hispanics in Administrative and Supervisory positions. Of the 121 positions within this category 3 [were] Hispanics, 24 [were] Black, *192 while the remaining 94 [were] White." The report also found an underutilization "of minority teachers; especially Hispanic in each teaching category," as well as underutilization in other categories such as paraprofessionals, service/maintenance and social workers, learning disability specialists, physicians and attendance officers. It was resolved that defendant hire on a fifty/fifty minority-majority basis until affirmative action goals were met, and to use "whatever means necessary, consistent with all appropriate Federal and State guidelines and laws to assure the selective appointment of qualified staff...." The "ultimate goal" of the plan was to parallel the statistics of the instructional and noninstructional staff with that of the student population.
A document from the Fall Report submitted shows that in the year of 1982-1983 the percentages of student groups enrolled were as follows: White: 18.4%, Black: 45.8%, Hispanic: 31%, American Indian: .2%, Asians Pacific Island: 4.6%.
An August 24, 1983 resolution submitted by the Board provided that its Affirmative Action Plan be further implemented and
BE IT FURTHERED RESOLVED, that by utilizing the aforementioned criteria, a rank ordered list be promulgated and such assignments be made in rank order as there are vacancies for such period of time as may be determined by this Board, and ...
BE IT FURTHER RESOLVED, that this Board of Education achieve more efficaciously the objectives of the affirmative action goals as enunciated in the resolution of October 13, 1976. (Emphasis added)
Finally, the Board updated its Affirmative Action Plan and goals in a resolution dated February 20, 1985 after new statistical data was received and analyzed.
These documents evince a bona fide sensitivity to past discrimination and its continuing effects in the Jersey City School System. This principle was recognized in Porcelli v. Titus, 302 F. Supp. 726 (D.N.J. 1969), aff'd 431 F.2d 1254 (3d Cir.1970), cert. den. 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1971) which is similar to the present case. In Porcelli, the Newark *193 Board of Education discarded an eligibility list originally formulated by exclusive use of examinations which were scored and resulted in a rank order list. A new method of appointment was adopted pursuant to which 20 out of 55 positions were filled by Blacks. Ten white teachers urged that the change in procedure was solely for the purpose of appointment on the basis of race  to get Blacks in who would not have been in under the old system. Plaintiffs claimed it was thus a violation of the Civil Rights Act of 1964, and the Fourteenth Amendment. Porcelli, supra, 302 F. Supp. at 728-730.
The court noted that the defendant school board had found evidence of under-representation of Blacks in the school system. It also noted that the superintendent of schools, who had suggested the new hiring plan, had stated that he favored suspension of the original hiring plan because it "didn't represent the kinds of racial mix that [he felt] most important in accomplishing an educational program in the City of Newark." The court found that the abolition of the original promotional system was not merely "to appoint Negroes to promotional positions, but to obtain for these positions qualified persons, white or black, whose qualifications were based on an awareness of, and sensitivity to, the problems of educating the Newark school population." Porcelli, supra, 302 F. Supp. at 732-733.
Likewise, in the present case, under-representation of Hispanics and Blacks was found to exist by the Board, and then it took remedial steps through the affirmative action plan. This was part of the Board's managerial prerogative. The Association now concedes that the Board was free to adopt an affirmative plan. The overwhelming evidence in the Board's appendix shows that the Board was implementing its affirmative action plan when it made promotions from the Przystup List. Thus, the arbitrator's finding that there was no affirmative action plan being implemented is clearly erroneous and the existence *194 of a plan was not reasonably debatable. Also, the arbitrator's conclusion was inconsistent with and contradictory to the public policy and public welfare of achieving sound educational objectives.
Not only was the arbitrator mistaken on crucial facts which he used to support his award, he was also mistaken on some crucial legal points. He concluded that an affirmative action plan would violate the anti-discrimination provision in the Agreement, Article 16-8. It is not within the scope of an arbitrator's powers to decide whether a promotion would violate the Legislature's decree of no discrimination in employment in the public sector. See N.J.S.A. 10:5-12. Whether the promotions violated N.J.S.A. 10:5-12 was not arbitrable. Teaneck Bd. of Educ., supra, 94 N.J. at 16. Moreover, implementation of a valid affirmative action plan is not the impermissible discrimination contemplated in N.J.S.A. 10:5-12 or Article 16-8. Affirmative action hiring goals do not offend either the federal or the state constitution. Johnson v. Transportation Agency, 480 U.S. ___, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); United Bldg. & Constr. Trades Council v. Camden, 88 N.J. 317, 337 (1982) rev'd on other grounds and remanded, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). "[T]hose who seek to end racial discrimination must often be acutely color conscious," even where the imbalance is fortuitous in origin. N.J. Builders, Owners and Managers Association v. Blair, 60 N.J. 330, 336 (1972). "Constitutional color blindness ... is not generally apt when the attack is on official efforts toward the avoidance of segregation." Morean v. Bd. of Ed. of Montclair, 42 N.J. 237, 243-244 (1964). Here the Board's affirmative action plan was in furtherance of fulfilling the high educational functions entrusted to it by law. The arbitrator's finding that any affirmative action hiring plan was illegal was inconsistent with existing law and violative of the guidelines applicable to public sector arbitration.
*195 As to the promotions made from the Prystup List which are involved in Grievance # 1, we conclude that the arbitrator's decision was based on a mistake of facts and law which constitute undue means within the meaning of N.J.S.A. 2A:24-8a. We also find that the arbitrator exceeded the scope of his power within the meaning of N.J.S.A. 2A:24-8d. Old Bridge Tp. Bd. of Educ. v. Old Bridge Educ. Ass'n, 98 N.J. 523, 527 (1985). That portion of the award which disallowed promotions from the Przystup List is vacated and the judgment confirming same is reversed.
A second portion of the award and final judgment disallowed promotions made on the basis of interviews only. We fully agree that the procedural requirements of Article 16-1 required the Board to first compile a rank order list and then promote from that list. Even though the Board was free to unilaterally determine the promotion criteria, it was obligated after making that determination to give notice as to what the requirements were for promotion. It was also obligated to follow the criteria it established. Procedurally, it was then required to compile a rank order list. This the Board did not do. It simply conducted interviews and then made promotions. It made no apparent attempt to create a rank order list. In these circumstances, the arbitrator correctly decided that the appointments involved in Grievance # 2 which were made from no list violated Article 16-1 of the Agreement.
The judgment is reversed as to the promotions made from the Przystup List. Those persons involved in Grievance # 1 are to remain in their positions. The judgment is affirmed as to the interview-only list involved in Grievance # 2. We have been unable to identify the names of all of the persons involved in either grievance. We leave it to the parties to determine the names and positions. Assistance of the Chancery Division may be sought if necessary.
Affirmed in part and reversed in part.
NOTES
[1] Persons who would be affected by the arbitrator's decision were given notice and some intervened in the hearings. None of them are participating in this appeal. We cannot determine the names of all persons ultimately affected.