774 A.2d 615 (2001)
340 N.J. Super. 369
Wayne BORNGESSER, individually and as executor of the ESTATE OF Irene BORNGESSER, Plaintiff-Appellant/Cross-Respondent,
v.
JERSEY SHORE MEDICAL CENTER, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 24, 2001.
Decided May 14, 2001.
*616 Clara R. Smit, East Brunswick, attorney for appellant.
*617 Amdur, Boyle, Maggs & McGann, attorneys for respondent, (Michael E. McGann, on the brief).
Before Judges SKILLMAN, CONLEY and WECKER.
The opinion of the court was delivered by CONLEY, J.A.D.
Plaintiff, deaf since the age of four, appeals a jury verdict in favor of defendant on his claims brought under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to 49, and § 794(a) (commonly referred to as § 504) of the Federal Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701 to 796. The verdict was based upon the jury's findings that defendant had not failed to provide reasonable accommodation to plaintiff or his wife Irene during her hospitalizations and that defendant had not failed to "ensure effective communication with, and ... provide ... equal opportunity to participate in and understand" the medical care given to plaintiff's wife by defendant and its medical staff. We affirm in part, reverse in part, and remand for a new trial. As to defendant's cross-appeal, we affirm without further opinion. R. 2:11-3(e)(1)(E).

I.
The genesis for this litigation arises from the two hospitalizations of Irene in March/April 1995 and May 1995. Upon initial admission, Irene's heart had stopped as a result of ventricular tachycardia, which is an abnormally rapid heartbeat. Her heart was restarted through electroshock treatments but a number of her organs had failed, including her kidneys. During her first hospitalization, a catheterization and, subsequently, a defibrillator procedure were performed. When Irene developed an infection shortly after being released, she was returned to the hospital. During this second hospitalization, Irene, then thirty-eight years old, died.
There is no issue in this case of medical malpractice or of inadequate care. The underlying premise for both the LAD and § 504 causes of action is that throughout the hospitalizations the hospital's efforts to accommodate plaintiff's and Irene's handicap were inadequate and resulted in ineffective communication with the various treating doctors and nurses and, therefore, prevented plaintiff and Irene from participating in Irene's own course of care and treatment in the same manner as nonhandicapped persons would have been able to. Specifically, plaintiff claims that he and Irene required a sign interpreter fluent in American Sign Language (ASL), which the hospital should have provided.
The primary form of communication engaged in by doctors and nurses with their patients is, of course, verbal. As we have said, plaintiff has been deaf since his youth. Irene was deaf since birth. Both obtained their education in a school for the deaf and socialized with others who also were deaf, communicating primarily in ASL.
Their daughter Melissa, seventeen at the time of Irene's hospitalizations, is not deaf and in some instances has assisted them in communicating with the nondeaf. Melissa is not a trained ASL interpreter.[1] *618 Moreover, there is a fairly substantial dispute in the trial record concerning her involvement in the efforts of the doctors and hospital staff to communicate with Irene and plaintiff. Both through testimony of the doctors and nurses and through notes in the medical records, the hospital has asserted that Melissa was present during the times that critical medical information was conveyed to plaintiff and Irene and that through her interpretative efforts there was effective communication. Melissa denied during the trial that she was present during these times.
The medical records recording contemporaneous nurses' and doctors' notes reflect the communication barrier. A May 9, 1995, note includes the comment "Patient deaf and dumb and difficult to assess." In another note under Critical Care Problems, a nurse wrote "sensory deficit hearing impaired," and further states "difficult to communicate." Admissions history notes dated May 7, 1995, state "non-English speaking, dif[ficult] to understa[nd], speech impediment." Next to mental status on an admission "History and Physical" form is printed "unable to assess." A progress note dated March 20, 1995, states "[patient] is also a deaf mute so communication is poor." Another progress note observes "unable to speak but by impression she looks better." Under neurologic, Dr. Lamarche wrote in his consultation report dictated March 20, 1995, "difficult to examine ... the patient is deaf." A "patient flowsheet" dated March 21, 1995, states "[patient] is a deaf mute able to communicate by writing things down on paper but some of translation get[s] lost... [patient] can't tell me the names of meds, she pointed to her heart and to her arm indicating high b/p meds." Another comment on the "patient flowsheet" also dated March 21, 1995, states "admission [information] is incomplete [due to] to the lack of communicating, hard to get across your full idea."
The difficulty in communicating with both plaintiff and Irene was also reflected by the testimony of several of the doctors who treated Irene. Dr. Strauss examined Irene on March 20, 1995, in connection with her renal failure. He could not communicate with her and could only obtain a limited history because she was deaf. He further testified that he was unable to do a "review of systems," which involves a series of general questions, and admitted that, because of her handicap, he could not tell Irene that she had acute renal failure.
Dr. Doyle, Irene's family physician, testified that although he felt communication was adequate to treat her, the communication was limited and difficult. He admitted that Irene could not ask questions of him and that rarely, if ever, did she or plaintiff write notes to him. He also testified that the extent of the conversation with Irene was to let her know that she was very sick and to pat her on the head or shoulder. Dr. Doyle, however, did not feel he needed an interpreter as he felt he could communicate through Melissa. In essence, plaintiff presented proof from which a reasonable juror could have concluded that throughout the course of Irene's hospitalizations neither she nor *619 plaintiff was able to effectively communicate with the doctors and staff, at least when they attempted to discuss her medical condition and the care and treatment that the doctors determined were required.
On the other hand, defendants provided evidence from which a reasonable juror could have rejected much of plaintiff's and his daughter's testimony as to plaintiff's and Irene's limited ability to communicate and Melissa's disavowel of any involvement in the communication with the doctors. For instance, at trial, both nurses and doctors testified that their communication with plaintiff and Irene was adequate and that both understood the medical staff. Although denied by plaintiff, there was ample evidence presented to the jury that they both could lip-read, write notes and read simple printed material. Dr. Doyle, for instance, testified that he and the hospital staff communicated extensively with Irene and plaintiff through written notes, hand signals, and by using Melissa and Irene's pastor as interpreters. Nurse Vadas also testified that although she had noted on the hospital chart that there was a communication barrier, she considered that the problem had been solved through the use of written notes.[2]

II.
On appeal, plaintiff contends in points I, II and III that the judge erred in denying plaintiff's pretrial motion for summary judgment and in denying his trial motion for directed verdict on liability. The motion record and the trial record are not significantly different except that testimony was provided through witnesses during the trial as opposed to submission of deposition testimony. Both records clearly present disputes of material issues of fact such that both the motion for summary judgment and the motion for directed verdict were properly denied. We have considered plaintiff's contentions raised in points I, II and III and conclude they do not require further discussion. R. 2:11-3(e)(1)(E). Equally so, we are convinced plaintiff's contention in point IV that the trial judge abused her discretion in excluding four of plaintiff's non-party deaf witnesses is without merit and does not require further discussion. R. 2:11-3(e)(1)(E).

III.

a.

Points V and VIThe Weight of the Evidence and Jury Charge
In points V, plaintiff contends the verdict was against the weight of the evidence and the judge, therefore, erroneously denied his motion for a new trial. In point VI, he contends that the jury charge was erroneous in certain respects. As to the latter, we do not find merit to plaintiff's precise claims of error. We observe in this respect that the charge was extensively discussed during a recorded two day charge conference, and that it was a product of much of plaintiff's requests. The aspects of the charge now claimed to be error were not objected to below. Nonetheless, our consideration of the evidence *620 here in the context of our new trial scope of review convinces us that a miscarriage of justice occurred and that certain deficiencies in the charge, not raised by counsel but perceived by us, are the culprits.
As to the new trial motion, neither the trial judge, nor we in our review thereof, are to act as a thirteenth juror. A trial judge should not overturn a jury verdict as against the weight of the evidence unless, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). The trial judge must canvass the record, not to balance the persuasiveness of the evidence on one side as against the other but, rather, to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict. Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969). We are reminded, though, that our review is not limited to a determination of whether the trial court committed an abuse of discretion but, rather, we must make our own determination as to whether or not there was a miscarriage of justice, deferring to the trial judge only with respect to those intangible aspects of the case not transmitted by the written recordsuch as witness credibility, demeanor and the feel of the case. Id. at 6-7, 258 A.2d 706; R. 2:10-1.
In denying plaintiff's motion for a new trial here, the trial judge said:
The record has things both pro and con on ability to communicate....

The court's belief is that you have to look from the perspective of the hospital whether or not they were able to communicate with Ms. Borngesser and that it was up to the jury to make that decision.
The defendant had argued and the plaintiffs themselves had made an overarching issue of credibility whether or not the plaintiffs had asked for an interpreter. It was counsel for plaintiff's position that there's no obligation for the Borngessers to have asked for an interpreter and that is no doubt correct.
The problem is that at every moment the plaintiffs were saying that they had asked for an interpreter and that no one ever got them an interpreter. And there's no notes that reflect that. There's nothing in the medical records....

It is quite true and the court credits plaintiff's argument that the Borngessers really did not completely understand and that a sign language interpreter would have made it much easier for them to understand what was happening in the hospital. But the jury could have found that the fact that the plaintiff said so frequently they asked for an interpreter and there's nothing to show that that was communicated to the hospital some obligation on the plaintiffs to make it clear to the hospital that using the daughter and writing notes and nodding and lip reading was not sufficient for them, that they did not understand.

Plaintiff's counsel argues that this is such a clear case that the court should find as a matter of law that this jury verdict was against the weight of the evidence. And the court has candidly said that if the court had been a juror the court would have decided this case in favor of the plaintiffs, but that's after a three week trial, after having testimony of two experts, after seeing three interpreters, American sign language interpreters in the court trying to assist the plaintiff, witnesses and the spectators and understanding all the things which the court learned as a result of this trial.

*621 And the court does not believe that the hospital was in that position. ...
So the court denies the motion based on it being against the great weight of the evidence, although that denial is somewhat reluctant as I indicated because from hindsight or in retrospect it's clear to the court that the Borngessers did not understand fully what was going on.

[Emphasis added.]
We find it striking, and troublesome, that while the judge was convinced from the evidence that in fact plaintiff and Irene did not fully understand what was occurring, at least as to issues of complex medical matters, it was their obligation to bring that difficulty to the attention of defendant and they did not. The judge, therefore, concluded that the hospital reasonably thought effective communication was being provided. A violation of § 504 of the Rehabilitation Act, however, does not depend upon the hospital's awareness of the prohibited conduct. The United States Supreme Court held in Alexander v. Choate, 469 U.S. 287, 296-98, 105 S.Ct. 712, 717-19, 83 L.Ed.2d 661, 669-70 (1985), that § 504 prohibits discrimination even if it is unintentional. The Court noted that "discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus." 469 U.S. at 296, 105 S.Ct. at 718, 83 L.Ed.2d at 669. See Proctor v. Prince George's Hosp. Ctr., 32 F.Supp.2d 820, 828-29 (D.Md.1998).

b.
We must, of course, consider the verdict and the evidence in support thereof, in the context of the governing legal principles. § 504 prohibits discrimination in federally-funded programs thusly: "No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C.A. § 794(a). Defendant hospital is a recipient of federal funds and, thus, is subject to § 504. Moreover, because it is considered a place of public accommodation, Estate of Behringer v. Med. Ctr. at Princeton, 249 N.J.Super. 597, 642-43, 592 A.2d 1251 (Law Div.1991), it is subject to the provisions of LAD that "[a]ll persons shall have the opportunity... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation" without discrimination on the basis of handicap. N.J.S.A. 10:5-4. See N.J.S.A. 10:5-4.1.
Plaintiff's claim here is predominantly grounded in § 504. Moreover, in interpreting LAD in the context of claims of discrimination by the handicapped, the federal law has consistently been considered for guidance. Leshner v. McCollister's Transp. Sys., Inc., 113 F.Supp.2d 689, 691-92 n. 1 (D.N.J.2000); Ensslin v. Township of N. Bergen, 275 N.J.Super. 352, 363-64, 646 A.2d 452 (App.Div.1994), certif. denied, 142 N.J. 446, 663 A.2d 1354 (1995). See Chisolm v. Manimon, 97 F.Supp.2d 615, 621 (D.N.J.2000) ("[t]he New Jersey courts generally interpret the LAD by reliance upon federal court decisions construing the analogous federal antidiscrimination statutes."). See also Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990) (stating in the context of a gender and age discrimination case, that "[t]he substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience."). Thus, we analyze the merits of plaintiff's cause of action within the context of § 504.
As we have set forth, § 504 prohibits exclusion from participation in, and a denial *622 of, the benefits and services provided by a federally funded program because of one's handicap. One of the congressional objectives in the enactment of the laws designed to protect the handicapped is the removal of discrimination arising from communication barriers. See Americans with Disability Act of 1990, 42 U.S.C.A. § 12101(a)(5).
Federal regulations implementing § 504 address, among other things, such communication barriers. Critical to the dispute before us, part of those regulations govern the interaction between a hospital and its hearing impaired patients. We consider them instructive. Alexander v. Choate, supra, 469 U.S. at 304 n. 24, 105 S.Ct. at 722 n. 24, 83 L.Ed.2d at 674 n. 24.
These regulations provide in part:
(a) General. In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap:
....
(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons;
....
(b) Notice. A recipient [of federal funds] that provides notice concerning benefits or services or written material concerning waivers of rights or consent to treatment shall take such steps as are necessary to ensure that qualified handicapped persons, including those with impaired sensory or speaking skills, are not denied effective notice because of their handicap.

[45 C.F.R. § 84.52(a)(4),(b) (emphasis added).]
Additionally, the regulations state that a recipient such as the defendant "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1). The auxiliary aids that may assist in meeting the requirements of § 504 and the implementing regulations include "brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d)(3).[3]
But neither § 504 nor the governing regulations require more than such "appropriate" auxiliary aids as may be necessary to afford an equal opportunity to benefit or participate in provided services. 45 C.F.R. § 84.52(d)(1); 45 C.F.R. § 84.4(b)(1)(ii)-(iii). The regulations do not mandate services which "produce the identical result or level of achievement *623 for handicapped and nonhandicapped persons" so long as they "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit ... in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).
In order to establish a violation of § 504 here, plaintiff was required to prove that: 1) he and Irene had a disability; 2) they both were otherwise qualified to receive the medical benefits and services of the hospital; 3) the hospital receives federal financial assistance; and 4) they were denied the benefits of the program because the hospital did not provide an effective means of communication. Doherty v. Southern Coll. of Optometry, 862 F.2d 570, 573 (6th Cir.1988), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); Bonner v. Lewis, 857 F.2d 559, 562-63 (9th Cir.1988); Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F.2d 1103, 1107 (9th Cir.1987); Mayberry v. Von Valtier, 843 F.Supp. 1160, 1167 (E.D.Mich. 1994).
There is no issue as to whether plaintiff and Irene were disabled, "otherwise qualified," or that defendant received federal funds. The only dispute is whether defendant provided effective communication with plaintiff and Irene without a trained ASL interpreter. Courts have found violations of the Rehabilitation Act and the ADA where sign language interpreters have not been provided for a qualified deaf person. See e.g. Rothschild v. Grottenthaler, 907 F.2d 286, 293 (2d Cir.1990) (finding that school system must provide an enrolled hearing student's deaf parents with a sign language interpreter at "school initiated conferences incident to the academic and/or disciplinary aspects of their child's education"); Randolph v. Rodgers, 980 F.Supp. 1051 (E.D.Mo.1997) (holding that prisoner whose primary means of communication was sign language was entitled to interpreter, under the ADA and Rehabilitation Act, for disciplinary procedures, medical care, education programs, and counseling), rev'd in part, vacated in part, 170 F.3d 850 (8th Cir.1999) (inmate stated prima facie case against prison for violation of the ADA and Rehabilitation Act, but summary judgment was precluded because issue of fact existed as to whether a sign language interpreter was required in order to provide a reasonable accommodation).
Neither the precedents nor the regulations, however, establish a per se rule that sign language interpreters are always mandated. In a case arising under the Education for All Handicapped Children Act of 1975, 20 U.S.C.A. § 1401 to § 1487, the Supreme Court has held that sign language interpreters are not required when lip reading (or other accommodations) are sufficient. Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 210, 102 S.Ct. 3034, 3052, 73 L.Ed.2d 690, 714 (1982).[4]
What auxiliary aids would be required is a fact-sensitive issue that must be considered within the parameters of what is meant by "effective communication." We know that the objective of such communication is to assist the handicapped patient to participate in his or her care and treatment to the same extent a nonhandicapped patient would be able to do. Neither the Rehabilitation Act, the ADA, nor the applicable regulations define the meaning of *624 "effective communication." One commentator has observed:
Although `effective communication' is mandated by section 504 and Title III of the ADA, the term is not defined specifically by the regulations to either statute; nor does case law provide a precise meaning of this term. In the absence of a legal definition of the term, the meaning of `effective communication' may be ascertained by reference to standard dictionary definitions. `Communication' is defined as the `sharing of knowledge by one with another' or the `deliberate interchange of thoughts or opinions between two or more persons.' `Effective' means `capable of bringing about an effect.' Thus, `effective communication' encompasses the idea that knowledge is shared in a manner that is capable of bringing about a desired result, that is, the occurrence of a communicative exchange. Under this interpretation, a health care provider complies with the mandate of effective communication only if knowledge, thoughts, and opinions are successfully conveyed between patients and medical staff.
Alternatively, `effective communication' can be interpreted to mean that a deaf individual `actually understood' the content of the communication....
Similarly, effective communication in the medical context can be measured by assessing a patient's ability to understand information that doctors and staff attempt to communicate. In addition to a patient's ability to receive information from her doctors, effective communication also includes a patient's right to convey her own thoughts and opinions to medical staff. Deaf patients must be afforded a means to describe their symptoms, to relay important information about allergies, for example, and to inform medical staff about the basic circumstances surrounding their illness or injury.
[Elizabeth Ellen Chilton, Note, Ensuring Effective Communication: The Duty of Health Care Providers to Supply Sign Language Interpreters for Deaf Patients, 47 Hastings L.J., 871, 882-83 (1996) (footnotes omitted).]
Case law provides no concrete definition of effective communication. Rather, courts have simply held that a question of fact is involved. Bonner, supra, 857 F.2d at 563; Estate of Alcalde v. Deaton Specialty Hosp. Home, 133 F.Supp.2d 702, 707 (D.Md.2001); Bravin v. Mount Sinai Med. Ctr., 186 F.R.D. 293, 302-03 (S.D.N.Y.), vacated in part on other grounds, 58 F.Supp.2d 269, 273 (S.D.N.Y.1999); Proctor v. Prince George's Hosp. Ctr., supra, 32 F.Supp.2d at 828. In each case, however, the inquiry has focused upon the qualified handicapped person and whether, objectively, he or she in fact had sufficient communication with the recipient so as to have understood what was occurring and to be able to participate in and benefit from the federally funded services, as much as a similarly situated nonhandicapped person could have. See Rothschild v. Grottenthaler, supra, 907 F.2d at 290-91; Bonner, supra, 857 F.2d at 563-64; Soto v. City of Newark, 72 F.Supp.2d 489, 494-95 (D.N.J.1999); Proctor v. Prince George's Hosp. Ctr., supra, 32 F.Supp.2d at 828.
We pause here to observe that there is no evidence in this record that either plaintiff or Irene received medical care and treatment that was different from or unequal to what would have been provided a nonhandicapped patient and spouse. As we have said, the focus is upon the doctors' and hospital staff's communication with plaintiff and Irene during the two hospitalizations and their alleged exclusion from *625 any meaningful participation in the care and treatment of Irene. To be sure, the fact that the actual care and treatment that was provided was not discriminatory or unequal, is not dispositive. Aikins v. Saint Helena Hosp. 843 F.Supp. 1329, 1338 (N.D.Ca.1994). But that fact sharpens the focus of the factual inquiry that was required of the jury here.
We also pause to note that Irene's hospitalizations encompassed extensive interactions with the hospital staff and doctors over a total period of six weeks. Some involved everyday routines, other more complex medical procedures or discussions. It has been observed, as to the use of any particular means of communication, that:
The effectiveness of an auxiliary aid or service is measured by a flexible standard that takes into account the nature of the communication taking place and the length and complexity of the communication involved. The effectiveness of a particular auxiliary aid or service will also depend upon the abilities and needs of a specific individual with a hearing impairment.
[Chilton, supra, 47 Hastings L.J. at 884 (footnotes omitted).]
The Technical Assistance Manual similarly states:
In order to provide equal access, a public accommodation is required to make available appropriate auxiliary aids and services where necessary to ensure effective communication. The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the length and complexity of the communication involved.

....
ILLUSTRATION 2a: H goes to his doctor for a bi-weekly check-up, during which the nurse records H's blood pressure and weight. Exchanging notes and using gestures are likely to provide an effective means of communication at this type of check-up.
BUT: Upon experiencing symptoms of a mild stroke, H returns to his doctor for a thorough examination and battery of tests and requests that an interpreter be provided. H's doctor should arrange for the services of a qualified interpreter, as an interpreter is likely to be necessary for effective communication with H, given the length and complexity of the communication involved.
[Department of Justice, Technical Assistance Manual on the American With Disabilities Act, § III-4.3200 (emphasis added).]
See also Proctor v. Prince George's Hosp. Ctr., supra, 32 F.Supp.2d at 827-28 (in rejecting hospital's claim that, in general, the deaf patient was provided sufficient accommodation, the court observed that "courts have focused on specific instances during the interaction between the disabled individual and the public accommodation or public entity.").
As applied here, the hospital's reliance upon written notes in the context of the staff's everyday routine care of Irene would likely satisfy § 504. Indeed, that obviously was part of the jury's determination. On the record before us, we find no basis for interfering with that determination.[5] On the other hand, a sign language interpreter may have been required during those instances when communication *626 concerning Irene's medical care and treatment occurred, such as when her consents for the catheterization and defibrillator were obtained, and during the discussions with the doctors concerning those procedures. These are the critical aspects of Irene's hospitalizations during which the § 504 effective communication protections became essential. See Proctor, supra, 32 F.Supp.2d at 827 ("The treatment in this case involved several distinct procedures for which consent and follow-up were required and a period of physical therapy. [Plaintiff] had a right under the Rehabilitation Act to benefit equally from each of these services and to participate equally at all points in time."). See also Rothschild v. Grottenthaler, supra, 907 F.2d at 293 (§ 504 did not require a sign language interpreter for deaf parents for child's extracurricular school activities but did so require for academic and/or disciplinary meetings with school officials). Cf. Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (§ 504 did not require nursing school to accommodate deaf student's handicap by substantially altering its curriculum requirements); Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 154-55 (4th Cir.), cert. denied, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991).

c.
The jury, of course, concluded that even during the critical periods these effective communications did occur. This conclusion was the product of the following instructions:
In this case, plaintiffs, Wayne Borngesser and Irene Borngesser, claimed that defendant, Jersey Shore Medical Center discriminated against them on the basis of their disability. It is claimed that discrimination occurred by denying Wayne and Irene Borngesser reasonable accommodations for their disability when Irene Borngesser was hospitalized at the Jersey Shore Medical Center on those two occasions.
Now, in this case, the uncontroverted evidence shows that both Wayne and Irene Borngesser are profoundly deaf. Deafness is a disability. And, therefore, I as the Court have determined that Irene Borngesser and Wayne Borngesser were disabled. The plaintiff's claims in this case are based on section 504 of the Rehabilitation Act enacted in 1973, and the New Jersey law against discrimination enacted in 1972.
Now, defendant, Jersey Shore Medical Center denies it discriminated against Wayne and Irene Borngesser on the basis of their disability. Jersey Shore Medical Center maintains that they provided reasonable accommodations to ensure effective communication.
Now, under both federal and state law, Wayne and Irene Borngesser had a right to reasonable accommodations for their disability. The term, reasonable accommodation as used in these instructions means making modifications within the hospital which allow a person with a disability to engage in effective communication or allows a person with the disability, to enjoy the same benefits and privileges as a person who doesn't have a disability.
Auxiliary aids and services including a wide range of services and devices that promote effective communicationlet me try that one again. Auxiliary aids and services include a wide range of services and devices that promote effective communication. Let me give you some examples of auxiliary aids and services for individuals who are deaf.
These would include qualified interpreters, notetakers, written materials, closed captioned decoders, open and *627 closed captioning, telecommunications for the deaf, we call those TDD's, video text displays and exchange of written notes.
The hospital must provide the disabled with the benefit and service equal to that afforded others and ensure that they have had effective communication. The law does not require the deaf or the deaf family member to request or obtain an interpreter, TDD, closed captioned or any of the other effective means I've mentioned.
Those responsibilities belong to the hospital and effective communication must be provided with no additional cost to the family. The defendant hospital was required to ensure that effective communication with staff and physicians took place during each of Irene Borngesser's hospitalizations.
The law does not require a specific accommodation be provided but does provide that a reasonable accommodation must be made for a person with a disability and that a public accommodation such as a hospital, must ensure that effective communication takes place.
Further, the services provided by the hospital must be equally effective. Although the hospital is not required to produce the identical results or level of achievement for a handicapped person and/or a non-handicapped person, it must afford the disabled equal opportunity to obtain the same result, to gain the same benefit and participate in one's medical care.
The hospital also must have a procedure in place for effective communication in the emergency treatment for the hearing impaired. Further, in determining what accommodation is necessary, a hospital should consult with a person with a disability.
The ultimate decision as to what measures to take to ensure effective communication, rests in the hands of the hospital provided that the method chosen results in effective communication.
Now, there are also regulations that are promulgated under these laws that we've expressed that govern interaction between a hospital and a deaf patient. The regulations have determined that in certain circumstances, notwithstanding that a family member or a friend is able to interpret or is a certified interpreter, that a family member or friend may not be qualified to render the necessary interpretation because the facts such as emotional or personal involvement or considerations of confidentiality that may adversely affect the ability to effectively, accurately and impartially.
In determining whether the defendant has discriminated against the Borngessers, you must determine if they were afforded reasonable accommodations and whether the accommodations afforded them, even handed opportunity to participate in Irene Borngesser's own medical treatment.
You must notlet me try that again. You need not find specific, intentional discrimination to find for the plaintiffs. Discrimination against people with disabilities by public entities did not usually take the form of intentional discrimination that results from a dislike or an animus toward people with disabilities or result from a failure to treat people with disabilities the same as non-disabled.
Instead, there's discrimination against people with disabilities usually result from the failure to recognize that people with disabilities have special needs which according to the law must be accommodated by a public accommodation, for example, like the hospital in this case.

*628 People with disabilities have special needs that those without special disabilities do not. So in this case, you may find the defendant is liable for discrimination even though the defendant's actions were not based on a dislike for a person with disabilities. And even though the defendant did not treat the plaintiffs any differently than those without disabilities.
We recognize that we must not pick and choose "small parts" of a jury instruction but must focus upon its entirety. E.g. Mogull v. C.B. Commercial Real Estate Group, Inc., 162 N.J. 449, 466, 744 A.2d 1186 (2000). And, as we have previously said, plaintiff did not object to the charge below. Moreover, we have found no merit to the specific claims of plain error in the charge raised before us by plaintiff. Nonetheless, our sense of the evidence in this record, particularly the clear evidence of substantial communication difficulties, coupled with the trial judge's mistaken view in denying the motion for new trial that if the hospital reasonably thought it had provided effective communication, that would suffice, leads us to the conclusion that the verdict here may have been unjust and that it may have been the product of the jury instructions.
To begin with, the charge does not particularly focus the jury upon the sole issue of effective communication. Rather, it broadly encompasses all of the possible § 504 scenarios, including unequal services and benefits which may have been interpreted by the jury as including lack of adequate care and treatment. Secondly, the charge does not define what effective communication means. Thirdly, it does not instruct the jury that effective communication must be determined objectively from the perspective of plaintiff and Irene; that is to say, the fact that the hospital reasonably may have thought plaintiff and Irene understood the various medical discussions and procedures is not enough, rather, the jury must objectively determine whether such understanding did occur through the means of communication employed. Fourthly, the jury was not advised that the need for various auxiliary aids in communicating with Irene and plaintiff could differ depending upon the complexities of the hospital setting.
The jury in this trial deliberated for two days. During the course of that deliberation it requested a read back of the portion of the charge we have previously set forth. It obviously was having some difficulty in resolving the factual issues. Had the charge been more sharply focused upon the effective communication issue and included the instructions we find missing, we are convinced the verdict may have been different. We say this because the evidence strongly supports the view that while the hospital thought its communication during the more complex aspects of the relationship with Irene and plaintiff was effective and sufficient to allow them to participate in Irene's care and treatment, in fact it was not.
Not only was the jury not told the focus must be upon plaintiff's and Irene's understanding, but the charge tended to suggest to the contrary by instructing that "[t]he ultimate decision as to what measures to take to ensure effective communications, rests in the hand of the hospital provided that the method chosen results in effective communication." This statement is legally correct, Department of Justice, Technical Assistance Manual on the American With Disabilities Act, § III.4.3200 (1993), and on retrial it may remain as part of the charge. But, in addition to the other factors we have discussed, it must be made clear to the jury that the effectiveness of the method chosen must be viewed from the perspective of plaintiff and Irene.

*629 IV.

We thus affirm the verdict as to Irene's everyday routine nursing care. We reverse as to those periods during her hospitalizations when communication between the doctors and other staff concerning her medical care and treatment occurred, and remand for a new trial as to the effectiveness of that communication.
NOTES
[1] A recent law review article has commented upon the use of ASL and its uniqueness:

Individuals who are deaf have unique communication difficulties that vary tremendously in light of the communication mode of each individual. Many deaf individuals in the United States utilize American Sign Language (ASL) as their primary language and means of communication. Although derived from English, ASL is a distinct language "with a separate historical tradition, and separate morphological and syntactic principles of organization." For example, while an English speaking person might ask "[h]ave you been to San Francisco?," an ASL user might sign ""[t]ouch San Francisco already you?"" While an English speaking person might ask, "What are your hobbies?," an ASL user might sign, "Time offdo do do?" Moreover, ASL is based on a limited number of signs representing primarily concrete terms, and thus the average ASL user has a limited knowledge of English words.
[Bonnie Poitras Tucker, Access to Health Care For Individuals with Hearing Impairments, 37 Hous. L.R. 1101, 1105-06 (2000) (footnotes omitted).]
[2] In this respect, the hospital records contain notations that reflect adequate communication with Irene during her daily nursing care. For example: "[Patient] alert, awake, oriented. Communication by writing, feeling ok." "[Patient] nervous about procedure tomorrow but no other complaints." "Appropriately responsive thru writing and sign language." "[Patient] complaining of some lung tightness and productive cough and minineb treatment given as requested. Some relief noted. [Patient] with no difficulty communicating. [Patient] using some speech and pointing, etc." "Assessment complete[,] deaf mute able to communicate fine."
[3] Federal regulations under the American With Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213, define "auxiliary aides and services" as including:

(1) Qualified interpreters, notetakers, ... written materials, ... closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments[.]
[28 C.F.R. § 35.104 (emphasis added).]
The list is not exclusive. The Department of Justice's "Technical Assistance Manual" interpreting this regulation expands the list of auxiliary aids to include the "exchange of written notes." Department of Justice, Technical Assistance Manual on the American With Disabilities Act § III 4.3300 (1993). We consider the ADA regulations additional authority since the standards under the ADA and the Rehabilitation Act are comparable. McDonald v. Commonwealth of Pa., 62 F.3d 92, 95 (3d Cir.1995); Chisolm v. Manimon, supra, 97 F.Supp.2d at 622. See Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.1997) (stating that the Rehabilitation Act incorporates the standards of several sections of the ADA, including the section defining "reasonable accommodation."); 29 U.S.C.A. § 794(d).
[4] It has been observed that under § 504, unlike the ADA, federally funded health, welfare, or social services programs, including hospitals such as defendant here, do not enjoy an "undue burden" defense to the provision of sign language interpreters. Davis v. Flexman, 109 F.Supp.2d 776, 788 (S.D.Ohio 1999). The defendant has not asserted such a defense, hence, that issue is not before us.
[5] However, evidence of Irene's communication difficulties throughout the hospitalizations, including her daily interaction with the nursing staff, is relevant in understanding the difficulties that may have existed during the more complex medical communications. Therefore, that evidence will be admissible on retrial.