837 A.2d 1101 (2003)
364 N.J. Super. 608
In the Matter of JUVENILE DETENTION OFFICER UNION COUNTY.
Superior Court of New Jersey, Appellate Division.
Submitted November 17, 2003.
Decided December 11, 2003.
*1102 Loccke & Correia, Hackensack, for appellant-intervenor, Union County No. 8, AFL-CIO, IFPTE (Michael A. Bukowsky, on the brief).
Peter C. Harvey, Attorney General of New Jersey, attorney for respondent, Merit System Board (Elizabeth M. Laufer, Deputy Attorney General, on the brief).
Garrubbo, Romankow, Rinaldo & Capece, Berkeley Heights, for respondent, County of Union (Frank G. Capece, of counsel; James J. Seaman, Secaucus, on the brief).
Before Judges NEWMAN, FALL and PARRILLO.
The opinion of the court was delivered by PARRILLO, J.A.D.
Appellant Union County Council No. 8, AFL-CIO, IFPTE (the Union) appeals from a final administrative decision of the Merit System Board (Board) that granted respondent Union County's (County) request for eight bona fide occupational qualification (BFOQ) designations for male-only Juvenile Detention Officer (JDO) positions. At issue is whether the County has sufficiently demonstrated a BFOQ defense or justification to state and federal proscriptions against sex discrimination, based on the privacy rights of juvenile male detainees, to warrant the exemption relief it seeks. We conclude that a proper showing has been made and accordingly affirm the Board's decision.
These are the pertinent facts. On November 26, 2001, the County sought approval from the New Jersey Department of Personnel (DOP) to fill eight available JDO positions exclusively with males. Its application, therefore, requested eight BFOQ designations, pursuant to N.J.A.C. 4A:4-4.5, for male-only JDOs. These positions are in the male wing of the Union County Juvenile Detention Center (Center) where juvenile detainees between the ages of 11 and 17 reside, pending disposition of their cases. At the time, the Center *1103 housed 64 male juvenile detainees and 8 female juvenile detainees, and employed 21 male and 8 female JDOs.
To substantiate its request, the County explained that to ensure the proper level of care, custody and security at the Center, the JDOs in the male wing were required to maintain constant visual contact with the juvenile detainees, even when the detainees were showering, changing clothing and using the toilet, and were required to "perform intimate searches" of all detainees on a daily basis, occurring at bedtime, after visiting hours, and immediately prior to showering. As to the latter, the County further explained that seven JDOs were required when the male residents were showering:
Two staff stand in the shower area itself to maintain the required constant observation of the residents in the shower. One remains in the doorway to supervise entry and exit from the shower area. The other is positioned in the shower room with the residents for security reasons.... The remaining three on staff are stationed in the male wing conducting strip searches on residents preparing to enter the shower and issuing clothing to the residents leaving the shower. The need for this close observation and physical contact with nude male residents precludes the use of female juvenile detention officers in the male wing.[1]
Consequently, the County's application asserted:
To ensure the resident the right to privacy and that the psychological well-being is maintained, we prohibit JDOs of the opposite sex from conducting intimate searches, or observing residents while showering or toileting.
The County's application also detailed alternative options considered, but rejected as unfeasible. The first option included construction of a privacy screen in the male shower area, but was deemed impracticable since the shower area was not structurally amenable to such a change, and would involve an "inordinate [construction] expense" as well as an increased security risk which would accompany use of the screens.
The second alternative called for a shift in the "staffing pattern" in conducting strip searches at shower time, bedtime, and after visiting hours. Specifically, the County considered creating an all-female third shift, but ultimately rejected the plan because such a change would merely reshuffle the existing staff pattern, neither increasing the number of female officers, nor resolving the need for a specified number of male JDOs whose presence to observe or handle male detainees while nude was simply too continuous to schedule otherwise.
The final option involved placement of privacy screens around the toilet area in each dorm area. This proposal was ruled out because, beyond the inordinate expense to be incurred, such privacy enclosures would create a security breach by impeding the JDOs' ability to observe the residents.
As required, the County filed its application with the DOP's Division of Equal Employment Opportunity and Affirmative Action (Division) pursuant to N.J.A.C. 4A:4-4.5(c). The Director of the Division denied the application by letter of January 28, 2002, stating that "it is not permissible to refuse to hire an individual woman or man on the basis of stereotyped characteristics of the sexes", and suggesting instead, *1104 without further explanation, that the County simply reschedule the showers or use "temporary measures," such as "portable screens," to address the privacy issues.
The County timely appealed to the Board. In connection with the appeal, the County provided the Board with a similar BFOQ application for male-only JDOs at the Center, filed on December 22, 1992, which was approved by the DOP on March 23, 1993.
In a written opinion issued on September 13, 2002, the Board reversed the Director's decision and granted the County's request for eight male-only BFOQ designations. Utilizing a two-prong test, the Board concluded that (1) the BFOQ designations sought by the County were needed based on the particular job requirements; and (2) because of the nature of the Center's operations, no other reasonable accommodation could be made to eliminate the need for these exemptions. As to the former, the Board found that the juvenile detainees possessed a privacy right not to be viewed or handled by members of the opposite sex while being strip searched, showering or using the toilet, and that this privacy interest is "heightened" given that they are "at an age when they may be particularly vulnerable to serious psychological harm" if viewed naked by adult members of the opposite sex. As to the second prong, the Board found that the alternative solutions explored by the County were not feasible, and those suggested by the Union were not shown to be any more viable or acceptable.
On appeal, the Union argues that the Board lacked jurisdiction to review the matter since the Director's decision was final, and that in any event, the Board's decision was arbitrary, capricious and unreasonable.
We may dispose of the first contention summarily. As already noted, any request for BFOQ designation by the appointing authority must initially be filed with the Division. N.J.A.C. 4A:4-4.5(c). However, nothing in its enabling legislation, N.J.S.A. 11A:7-1 to -13, states that the Division's decision constitutes final agency action. On the contrary, N.J.S.A. 11A:2-6(b) authorizes the Board to review all appeals within the DOP, not specifically set forth in N.J.S.A. 11A:2-6(a) or N.J.S.A. 11A:2-11, de novo on the written record and render a final administrative decision in those matters. See Henry v. Rahway State Prison, 81 N.J. 571, 576, 410 A.2d 686, 688 (1980); West New York v. Bock, 38 N.J. 500, 519, 186 A.2d 97, 107 (1962). Since the review of BFOQ requests is not set forth in N.J.S.A. 11A:2-6(a) or N.J.S.A. 11A:2-11, it is clearly an appeal in which the Board may render a final agency decision on the written record. The Union's contention to the contrary is without merit.
It is equally well-settled that the Board's decision will not be upset unless it is arbitrary, capricious, unsupported by substantial credible evidence contained in the record, or in violation of express or implicit legislative policies. In re Taylor, 158 N.J. 644, 656-57, 731 A.2d 35, 41-42 (1999); In re CAFRA Permit No. 87-0959-5, 152 N.J. 287, 304, 704 A.2d 1261, 1269 (1997); Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 71, 494 A.2d 804, 811-12 (1985); Henry v. Rahway State Prison, supra, 81 N.J. at 579-80, 410 A.2d at 690-91. When reviewing factual findings of the Board, we are not free to substitute our own judgment as to the wisdom of a particular administrative action. Flanagan v. Civil Service Dep't, 29 N.J. 1, 12, 148 A.2d 14, 20 (1959). On the contrary, we must give weight to the presumed expertise of the administrative agency when reviewing its decision. Shahmoon Industries, Inc. v. Department of Health, 93 N.J.Super. 272, 282, 225 A.2d 699, 704 *1105 (App.Div.1966), certif. denied, 49 N.J. 358, 230 A.2d 392 (1967). Furthermore, we generally defer to the agency's interpretation of its own enabling legislation, as well as regulations promulgated to implement the statute which the agency is charged with administering. Medical Society v. Department of Law and Public Safety, 120 N.J. 18, 25-26, 575 A.2d 1348, 1352-53 (1990); Appleby v. Civil Serv. Comm'n, 190 N.J.Super. 249, 255, 463 A.2d 346, 350 (App.Div.1983). We, therefore, address the Union's remaining contention against the backdrop of these governing standards.
Both state and federal proscriptions against sex-based discrimination recognize a limited BFOQ exception. The New Jersey LAD provides in pertinent part:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the... sex ... of any individual, to refuse to hire or employ or to bar or to discharge... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment;... provided ... that nothing herein contained shall be construed to bar an employer from refusing to accept for employment any person on the basis of sex in those certain circumstances where sex is a bona fide occupational qualification, reasonably necessary to the normal operation of the particular business or enterprise ...
[N.J.S.A. 10:5-12(a) (emphasis added).]
Section 703(e) of Title VII, 42 U.S.C.A. § 2000e-2(e), the Civil Rights Act of 1964, contains a virtually identical provision:
[I]t shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

[42 U.S.C.A. § 2000e-2(e).][2]
Given the identity of these provisions, and the paucity of New Jersey precedent, see Spragg v. Shore Care, 293 N.J.Super. 33, 49, 679 A.2d 685, 693 (App.Div.1996), we look to federal law for guidance in dealing with the BFOQ defense, as we have traditionally done in the field of employment discrimination generally. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903, 906 (1990); Borngesser v. Jersey Shore Med. Ctr., 340 N.J.Super. 369, 380, 774 A.2d 615, 621 (App.Div.2001); Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 429-30, 667 A.2d 355, 359 (App.Div.1995).
It is clear "that the BFOQ exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." Dothard v. Rawlinson, 433 U.S. 321, 334, *1106 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786, 799 (1977). See also International Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 201, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158, 174-75 (1991). As such, the employer has a very heavy burden to establish the exception. See, e.g., Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228, 235 (5th Cir.1969). In this regard, Section 703(e) of Title VII requires that the BFOQ must be "reasonably necessary to the normal operation of that particular business," and not simply a matter of business convenience. 42 U.S.C.A. § 2000e-2(e). See also Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 388 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). In Diaz, the court interpreted § 703(e) to mean that, in order to establish a BFOQ defense, an employer must prove that "the essence of the business operation would be undermined by not hiring members of one sex exclusively." 442 F.2d at 388. See also International Union v. Johnson Controls, supra, 499 U.S. at 201, 111 S.Ct. at 1204, 113 L.Ed.2d at 174. Stated somewhat differently, an employer has the burden of proving "that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved," Weeks v. Southern Bell, supra, 408 F.2d at 235. See also Dothard, supra, 433 U.S. at 333, 97 S.Ct. at 2729, 53 L.Ed.2d at 800, and that this belief is based on actual sexual characteristics rather than upon stereotyped assumptions. Griffin v. Michigan Dep't of Corrections, 654 F.Supp. 690, 701 (E.D.Mich.1982). Moreover, some courts have imposed an additional burden on the employer and have held that the BFOQ defense is not available if there was some less restrictive alternative available to the employer which could have avoided the sex classification. Harless v. Duck, 619 F.2d 611, 616 n. 6 (6th Cir.1980); United States Equal Employment Opportunity Comm'n v. Sedita, 816 F.Supp. 1291, 1295 (N.D.Ill.1993).
There are two general types of cases that deal with the BFOQ defense. One line of cases concerns those situations where an employer refuses to hire any members of one sex due to the employer's perception of the privacy interests of its clients or customers, rather than the employee's physical capacity to perform the responsibilities connected with the job, which comprise the second line of cases. It is the first line of cases that provides the analytical framework for resolving the matter at hand.
Case law recognizes certain instances where the privacy interests of individuals justify sex-based employment discrimination by an employer. Indeed, in the only published opinion in New Jersey dealing with the BFOQ defense, Spragg, supra, we considered the privacy interests of patients admitted to a hospital or other health care facility in determining the propriety of a private sector employer's assignment of male home health aides exclusively to care for male patients. In assessing the male employee's discrimination claim and the employer's BFOQ defense, we held that "[w]here the BFOQ is based on privacy considerations, such considerations must go to the core of an employee's job performance and that performance must be involved in the central purpose of the employer's enterprise." 293 N.J.Super. at 52, 679 A.2d at 694. We concluded that there were "genuine issues of material fact regarding the reasonableness of the employer's actions, if not its motivations in instituting the gender segregation policy, so as to preclude the court from concluding that defendant was entitled to judgment as *1107 a matter of law." Id. at 53, 679 A.2d at 695.
In the area of health care, federal cases have accorded dispositive weight to a patient's privacy rights. Fesel v. Masonic Home of Delaware, 447 F.Supp. 1346, 1350 (D.Del.1978), aff'd, 591 F.2d 1334 (3d Cir.1979), involved male nurses at a retirement home who had the duty of dressing patients, giving baths, changing pads, administering catheterizations and assisting with toilet use. Ibid. The court concluded that to meet the BFOQ exception, the employer must show that (1) a factual basis existed for believing that women would object to intimate touching by male nurses, and (2) a showing that the schedules of the employees could not be adjusted to avoid the privacy violation. Ibid.
The first criteria, a factual basis, was deemed met by the court when the home's administration officials stated their beliefs as to the patients' preferences, when medical personnel offered their opinions, and when some patients themselves testified. As to the second criteria, the court determined that rescheduling could not avoid violations of the patients' privacy rights and, as a result, the BFOQ was applied and the home was allowed to exclude male nurses. Ibid.
In Backus v. Baptist Medical Center, 510 F.Supp. 1191 (E.D.Ark.1981), vacated as moot, 671 F.2d 1100 (8th Cir.1982), the court cited Fesel, supra, to justify defendant Medical Center's policy of not hiring male nurses in labor and delivery. "Due to the intimate touching required in labor and delivery, services of all male nurses are inappropriate. Male nurses are not inadequate due to some trait equated with their sex, rather it is their very sex itself which makes all male nurses unacceptable." Id. at 1195. The court therefore concluded "that requiring labor and delivery nurses to be female is a bona fide occupational qualification (BFOQ) which is `reasonably necessary to the normal operation of [its] particular business or enterprise.' " Id. at 1195-96.
In contrast, courts have not accorded adult prison inmates the same privacy interest protections as hospital patients, and are generally split as to whether such privacy or related interests, to the extent they exist, justify sexually discriminatory hiring and promotional practices in state correctional facilities. Compare Torres v. Wisconsin Dep't of Health & Social Services, 859 F.2d 1523 (7th Cir.1988), cert. denied, 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194 (1989) and 489 U.S. 1082, 109 S.Ct. 1537, 103 L.Ed.2d 841 (1989), and Robino v. Iranon, 145 F.3d 1109 (9th Cir.1998), with Griffin, supra, 654 F.Supp. at 703, and Bowling v. Enomoto, 514 F.Supp. 201, 205 (N.D.Cal.1981), and Hudson v. Goodlander, 494 F.Supp. 890, 893 (D.Md.1980). In this area, courts usually apply a balancing test, weighing on the one hand the inmate's right to privacy against, on the other hand, "the legitimate penological objective of providing equal job opportunities regardless of sex, as mandated by Title VII." Griffin, supra, 654 F.Supp. at 702. In Griffin, the balance was struck in favor of the latter since the court found no protected constitutional right of an inmate against being viewed while naked by correctional officers of the opposite sex, and, in any event, a greatly diminished expectation of privacy given the circumstances of penal confinement. Id. at 702-03. Other courts have resolved the conflict between the right of one sex not to be discriminated against in job opportunities and the interest in maintaining some level of privacy "by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards." Jordan v. Gardner, 986 F.2d 1521, 1527 (9th Cir.1993) (quoting Smith v. Fairman, 678 F.2d 52, 55 (7th Cir.1982), cert. denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983)). See also Ludtke v. Kuhn, 461 *1108 F.Supp. 86 (S.D.N.Y.1978); Reynolds v. Wise, 375 F.Supp. 145 (N.D.Tex.1974). In other words, to prevail, employers must demonstrate that such a direct conflict could not be avoided. Griffin, supra, 654 F.Supp. at 704.
On the other hand, in the context of youth detention facilities, courts have consistently recognized a greater privacy interest for juvenile detainees. Although the issue has never been decided in our jurisdiction, other courts have recognized a BFOQ exception to protect the juvenile's enhanced privacy interests.
In City of Philadelphia v. Pennsylvania Human Relations Comm'n, 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973), a youth center hired as supervisory personnel only those individuals who were of the same sex as the juvenile residents who ranged in age from seven to sixteen years. The Center adopted this policy due to the contact between supervisors and the youths, such as monitoring showers and conducting body searches. In permitting the gender-based BFOQ designation for the supervisors, the court was persuaded that intimate contact by those of the opposite sex could cause a "traumatic condition" and "irreparable harm to [a] psyche[,]"[3]id. at 102-03 n. 8, and concluded:
Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological difference between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex.

[Id. at 103 n. 7.]
In another youth detention case, In re Long, 55 Cal.App.3d 788, 127 Cal.Rptr. 732 (1976), in which guards maintained a constant watch over juvenile detainees, the court found that intimate exposures justified the exclusion of female observers in male living units and in toilet and shower areas of the gymnasium. The court reasoned:
Thus, an accretion of decisional law recognizes that privacy, in both its tort and constitutional manifestations, encompasses the individual's regard for his own dignity; his resistance to humiliation and embarrassment; his privilege against unwanted exposure of his nude body and bodily functions. The latter kind of exposure assumes particular poignance when it occurs within the perceptive range of strangers of the opposite sex. At that point the exposure clashes with a deeply held social, moral and emotional bias pervading Western culture.

[Id. at 736.]
In another California case, Long v. California State Personnel Board, 41 Cal.App.3d 1000, 116 Cal.Rptr. 562 (1974), the court upheld a "male-only" qualification for the position of chaplain at a youth training center for males against claims that such a policy violated equal protection guarantees. Reasoning that the position of chaplain requires personal contact which might assault the modesty of some wards if the *1109 chaplain were female and might encourage sexual assault of her by a ward, the court held that the interests of the youth male wards in their privacy and rehabilitation and the interests of the Youth Authority and of the public in rehabilitation of the wards overrode any equal protection rights claimed by the petitioner, a female applicant. Id. at 571.
And in another context, the Third Circuit Court of Appeals has addressed the privacy interests of juvenile patients in a psychiatric facility. In Healey v. Southwood Psychiatric Hospital, 78 F.3d 128, 133 (3rd Cir.1996), the court upheld the institution's scheduling practice, which insured that both a male and female child care specialist were available on every shift in order to meet the therapeutic needs and privacy concerns of its mixed-gender patients.
Of course, the facts in the instant matter are similar to those peculiar to the youth authority facility cases mentioned above. We also find the rationale employed in those cases persuasive and compels the result we reach here. In this case, there is no real dispute that the privacy interests of male juvenile detainees in not being viewed by female JDOs while showering, using the toilet, and being strip-searched are legitimate and would be undermined by failing to place gender-specific requirements on the appointment of JDOs. Indeed, the Union has presented no proof to the contrary and itself recognizes the juvenile's privacy interests must be weighed against the equal employment opportunity rights of its members. In that balance, the Board weighed heavily not only the need for bodily privacy, but also the psychological effect on the youth who may feel humiliated, embarrassed and degraded by having members of the opposite sex observe them in the most intimate of exposures, with its resultant hindrance of the juvenile's rehabilitation. As the Board asserted, given their youth, the detainees are "particularly vulnerable to serious psychological harm," heightening their need for bodily privacy. Based on this record, we cannot say that the balance struck by the Board in favor of the County was arbitrary, capricious, or unreasonable, violated express or implied legislative policies, or was constitutionally offensive. In re Taylor, supra, 158 N.J. at 656-57, 731 A.2d at 41-42.
This is particularly so since the County has amply demonstrated that the direct conflict between the juvenile detainees' interest in minimal privacy and the Union members' equal employment opportunities under federal and state law could not otherwise be avoided by resort to less drastic alternatives. The Union's contention to the contrary, the Board fully considered several options to the BFOQ designations, but rejected each with detailed explanations citing, among other things, cost and security concerns as well as the fact that constant visual monitoring of detainees during intimate exposures and performing strip searches are at the core, and comprise a "significant portion", of a JDO's job responsibilities. On the other hand, no showing has been made that any of the Union's suggested alternatives, including the assignment of a roving officer to accompany detainees to the showers and bathroom, was feasible. On the contrary, the Board reasonably found that no other accommodations could be made to eliminate the need for the BFOQ designation: "because of the nature of the operation of the Juvenile Detention Center, [the County] could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests asserted by [the County] and the employment of female JDOs." We defer to the employer's representations concerning the reasonableness of alternatives. See, e.g., Fesel, supra, *1110 447 F.Supp. at 1346; Jones v. Hinds General Hospital, 666 F.Supp. 933 (S.D.Miss., 1987); Backus, supra 510 F.Supp. at 1191; Norwood v. Dale Maintenance System, Inc., 590 F.Supp. 1410 (N.D.Ill.1984).
Affirmed.
NOTES
[1] Notably, the County also prohibited male JDOs from conducting intimate searches or observing the bathing and toilet use of female juvenile detainees.
[2] In addition to the statutory exemption, the Equal Employment Opportunity Commission has issued guidelines narrowly interpreting the BFOQ exception as it relates to sex discrimination, making clear that refusal to hire a woman on the basis: (1) of "stereotyped characterizations"; (2) on "assumptions of the comparative employment characteristics of women in general"; or (3) because of client or customer "preferences", is prohibited. 29 C.F.R. § 1604.2(a)(1).

New Jersey regulations dealing with BFOQs are similar. See N.J.A.C. 13:11-1.5(b),(d)(1)-(4), (e). In addition, in accordance with its statutory grant of authority, the Board promulgated N.J.A.C. 4A:4-4.5, which permits, under very limited circumstances, the granting of BFOQs based upon gender, religion or national origin when these factors "are essential to successful job performance and the normal operation of the appointing authority." N.J.A.C. 4A:4-4.5(a).
[3] In this regard, the court noted:

[t]o subject a girl in this age group to a thorough search of her body by a male supervisor could cause not only a temporary traumatic condition, but also permanent irreparable harm to her psyche. It is no different where females supervise male juveniles. To have a woman supervisor observe daily showers of the boys at a time in life when sex is a mysterious and often troubling force is to risk a permanent emotional impairment under the guise of equality.
[Id. at 102-03].