928 A.2d 900 (2007)
395 N.J. Super. 302
Jeanne KLAWITTER and Dennis J. DeBonis, Plaintiffs-Respondents,
v.
CITY OF TRENTON, a municipality of the State of New Jersey, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2007.
Decided July 31, 2007.
*902 Kathleen C. Goger, Newark, argued the cause for appellants (Singer & Goger, attorneys; Ms. Goger and Susan S. Singer, on the brief).
John E. MacDonald, Lawrenceville, argued the cause for respondents (Stark & Stark, attorneys; Mr. MacDonald, of counsel and on the brief; Michael T. Pidgeon, on the brief).
Before Judges SKILLMAN, LISA and HOLSTON, JR.
The opinion of the court was delivered by
LISA, J.A.D.
This appeal by the City of Trenton is from judgments on different employment-related claims by two members of the Trenton Police Department.
Jeanne Klawitter, who is Caucasian, was a patrol level detective. She asserted a claim of reverse discrimination based on race under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, because she was denied a promotion to sergeant in favor of another officer, James Ingram, an African-American. The jury found in Klawitter's favor, and awarded her $79,538 as compensation for emotional distress damages. The judge then awarded Klawitter $21,993.43 in prejudgment interest and $33,846.45 in attorney's fees and costs. The City's new trial motion, on the grounds that the verdict was against the *903 weight of the evidence as to both liability and damages, was denied.
The other claim was brought by Dennis DeBonis, who is also Caucasian. He retired from the police force, but less than thirty days after the effective date he sought to cancel his retirement and requested reemployment to his former position as a sergeant. The City informed him he would have to be placed on a reemployment list and could not be considered for the sergeant vacancy then available, which would be filled from the existing promotional list. DeBonis claimed the City wrongfully rejected his decision to cancel his retirement and his request for reemployment, in violation of a Department of the Treasury, Division of Pensions and Benefits regulation, N.J.A.C. 17:4-6.3, that authorizes cancellation of retirement within that timeframe. DeBonis also claimed he was denied the vacant sergeant position in favor of Ingram on the basis of his race, in violation of the LAD. The Law Division entered partial summary judgment in DeBonis' favor on the issue of liability on his N.J.A.C. 17:4-6.3 claim. DeBonis' claims were tried jointly with Klawitter's. On his N.J.A.C. 17:4-6.3 claim, the only trial issue was damages and the jury awarded DeBonis $35,488. The judge then added prejudgment interest of $9,812.06. The jury rejected DeBonis' LAD claim, and DeBonis has not cross-appealed from the no cause for action on that claim.
With respect to DeBonis, the City appeals from the partial summary judgment as to liability on his wrongful failure to rehire claim. The City contends that DeBonis' right to cancel his retirement within thirty days under applicable pension regulations did not entitle him to immediate reemployment in his former position, which, instead, was controlled by priorities promulgated by civil service laws and regulations. We agree with the City and reverse the judgment in favor of DeBonis.[1]
With respect to Klawitter, the City argues that the jury's verdict was against the weight of the evidence as to both liability and damages. We reject the City's argument and affirm the judgment for damages and prejudgment interest. The City also appeals from the attorney's fee award, contending that it included compensation for some services rendered to DeBonis. From our review of the record, this argument contains sufficient merit to warrant reversal of the fee award and remand for reconsideration.

I
The facts relevant to Klawitter and DeBonis are, to some extent, intertwined, and are otherwise separate. Because the principal appeal issue regarding Klawitter is whether the verdict was against the weight of the evidence, a detailed factual recitation with respect to her is necessary. The controlling appeal issue as to DeBonis is a matter of law, involving the interpretation of civil service and pension laws and regulations, thus requiring a less detailed factual recitation as to him.

A.
Klawitter became a Trenton police officer in 1988, beginning as a patrol officer and later advancing to the position of detective. Trenton is a civil service municipality. Klawitter was first eligible to take the sergeant's exam in 1994. She took the exam and passed it, and was placed on the *904 sergeant's promotional list. Klawitter pursued educational opportunities made available through the department, and she twice received commendations for her service.
In the Fall of 1998, the Department anticipated five sergeant vacancies, four by virtue of retirements effective November 1, 1998, including that of DeBonis, and the fifth expected on December 1, 1998, due to the expected retirement of Lieutenant Douglas Rowland, whose lieutenant position would be filled by the promotion of an existing sergeant. Rowland, however, changed his retirement date to February 1, 1999.
The City created a fifth sergeant vacancy, to be available in December 1998. It did so by determining that the position of Sergeant Richard Girman was vacant. Girman was under indictment, with a trial date looming. He had been on unpaid suspension since February 15, 1997. It was very unusual, and perhaps unprecedented, for the City to create a vacancy with respect to a position held by a suspended officer. Nevertheless, the fifth sergeant vacancy was thus established.
Under civil service employment rules, promotions to the five sergeant vacancies would be made from the current promotional list. On that list, Klawitter had the same ranking as Officer John Dehart, a Caucasian, and Ingram. The ranking is based upon a combination of test scores on the sergeant's exam and seniority. Klawitter and Dehart joined the department on the same day, and their seniority was therefore identical. They each scored seventy-seven on the exam. With their seniority factored in, their overall score was 78.62. Ingram had four years greater seniority than Klawitter and Dehart. His test score was seventy-six, but with his seniority factored in, his overall score was also 78.62.
Four other officers had higher rankings than the three tied officers, and they were awarded the four sergeant positions effective November 1, 1998.[2]
It is the filling of the fifth vacancy that is the subject matter of Klawitter's claim. As of November 1998, the City's public safety director was Dennis Keenan, and he was responsible for "breaking the tie" and selecting between the three officers. Keenan had been employed by the City since 1962. But until the Spring of 1998, his service had all been in the fire department, where he worked his way up through the ranks to the position of fire chief.
Keenan acknowledged that he was under great pressure to make a decision quickly, but he denied that he was under pressure to promote Ingram. Because of his lack of experience on an issue such as this, he consulted with the personnel officer for the City and the Department of Personnel for advice on how to break the tie. He was advised that no criteria for the decision existed and that he should choose the candidate he believed would be best suited for the position. According to Keenan, he reviewed the officers' employment records and spoke with their superior officers. He also decided to interview each of the officers. Because of his lack of police background, he would not be able to ask questions of a technical nature, but planned to use the interviews merely to assess the demeanor of the candidates.
All three interviews were brief, lasting between ten and twenty-five minutes. When Klawitter entered the room, Keenan recognized her as playing on a softball *905 team with his daughter. They chatted briefly about that subject. Klawitter then asked Keenan: "Is this interview or so-called interview a waste of my time, because I heard that it was." Klawitter's question was prompted by rumors that the decision to hire Ingram had already been made. According to Klawitter, Keenan responded by stating that he "was under a lot of pressure to hire the black candidate." Hearing this response, Klawitter felt "crushed" and "devastated" that she would not be given a fair chance for the promotion. During the remainder of the session, which Klawitter claimed lasted a total of only ten minutes, there was no discussion about Klawitter's job performance as a police officer or her qualifications for sergeant.
Dehart also reported that his interview was short, lasting about fifteen to twenty minutes. Keenan asked Dehart to speak a little bit about himself, but did not ask anything specific about his qualifications for the sergeant position.
Responding to this testimony from Klawitter and Dehart, Keenan stated that the interviews of all three candidates were about the same length, fifteen to twenty-five minutes. He acknowledged that he discussed personal matters as opposed to job related issues, which was consistent with the limited purpose for which he was conducting the interviews. He denied telling Klawitter that he was under pressure to promote an African-American officer or Ingram specifically, although he acknowledged that she asked whether the interview was a waste of time. During his trial testimony, no one asked Keenan what he did say in response to Klawitter's question.
According to Keenan, he ranked Ingram and Dehart equal in terms of demeanor, with Klawitter ranked slightly lower based upon her question as to whether the interview was a waste of time, which he believed was inappropriate. He found Ingram the most impressive candidate based upon his experience as a detective in the major crimes bureau, which came at the direct appointment of the chief, thus indicating the chief's high level of confidence in Ingram's abilities, the good reviews Keenan received about Ingram from his superior officers, and Ingram's four years greater seniority.
By letter of December 18, 1998, Keenan advised Ingram of his selection to fill the fifth vacancy, effective December 23, 1998. By a letter of the same date, Keenan advised Klawitter that, while all three eligible applicants were considered "qualified," Ingram was considered "best suited for the promotion at this time."
Klawitter claimed that she, Ingram, and Dehart were equally qualified for the promotion based upon their equal ranking on the promotional list, and Ingram was selected based upon his race.
In support of their race discrimination claims, both Klawitter and DeBonis argued that the police department went out of its way to ensure that there would be a sergeant's position available in December 1998, and engaged in an unusual and perhaps unprecedented action with respect to Girman in order to create a fifth vacancy after Rowland delayed his retirement from December 1, 1998 to February 1, 1999. They claim that this was all done to assure that a vacancy would be available in December 1998 and would be filled by Ingram. Indeed, although the record does not reveal the disposition of Girman's criminal charges, it does reveal that he ultimately returned to Trenton's police force.
Further, plaintiffs presented evidence suggesting that the City manufactured the Girman vacancy expressly for Ingram's benefit. A new promotional eligibility list *906 for sergeant would be effective on February 11, 1999. The test for that list had been given some months earlier. Klawitter and Dehart had taken the test and were on the list. Ingram, however, was not on that list. Therefore, Ingram's eligibility for promotion to sergeant would expire with the expiration of the current list on January 7, 1999. Thus, according to plaintiffs, this created urgency to promote Ingram before the opportunity expired.[3]
Plaintiffs also presented the testimony of former police chief Ernest Williams. Williams stated that in late Summer or early Fall 1998, he was summoned to the mayor's home and asked to accelerate his anticipated April 1, 1999 retirement date in order to create a vacancy down the department's chain of command. According to Williams, the mayor wanted to promote Ingram to sergeant and he was looking for a way to create a vacancy before the current promotional list expired. Williams said this conversation was unusual because normally the mayor did not discuss promotional issues with him. Williams refused to change his retirement date.
Trenton Mayor Douglas Palmer testified and acknowledged that he was aware in the Fall of 1998 of the sergeant vacancy and that he discussed it with Williams. However, the mayor claimed he did so only in relation to an allegation that came to his attention that police officers were paying superior officers to retire in order to create a vacancy into which they could be promoted. More specifically, the mayor claimed he had been approached at a Mercer/Trenton African-American Chamber of Commerce event by a Sergeant Bernard Hill, who asked whether Ingram was going to have to pay for his promotion. The mayor asked Hill to explain what he meant by that question, and expressed surprise that such a practice was occurring in the department. The mayor denied asking Williams to retire early in order to create a promotional opportunity for Ingram.
The mayor admitted that "Jimmy" Ingram was a "good friend" of his, that Ingram's wife was the mayor's former girlfriend, and that he thought it would be "nice" if Ingram were promoted. The mayor also acknowledged that he had been pressured by members of the community to promote Ingram. Moreover, the mayor, who was the first African-American mayor of Trenton, "certainly knew that we needed more diversity, more women, more African-Americans and Latinos in upper ranks" of the police department. He acknowledged that "people may have known that [he] wanted more diversity." Indeed, it was public knowledge that the mayor felt strongly about this issue. The mayor commented that the City was operating under a consent decree that required improvement in its hiring practices and promotion opportunities for minorities and women in the fire department. The mayor's chief of staff, Gwendolyn Harris, also testified and mentioned the existence of a consent decree, and suggested it applied to the police department as well, but she could give no particulars, such as when it was entered, the time period of its effectiveness, or its provisions. The mayor denied that he ever manipulated the system in order to promote a woman or minority, and he denied ever instructing Keenan to appoint Ingram or even discussing the subject with Keenan.
During the same time these events were occurring, the mayor supported a public *907 referendum under which the police department would be managed by a civilian police director as opposed to a police chief who had been promoted through the civil service system. In this manner, upon Williams' retirement, the mayor could circumvent the requirement to promote one of the three deputy chiefs. According to the mayor, he did not deem any of these three individuals, all of whom are Caucasian, sufficiently qualified for the top job. He believed they were too laid back and that new blood should be brought in to shake up the organization. The referendum passed, and when the opportunity arose to choose the first civilian police director, the mayor appointed James Golden, who is African-American.
Finally, plaintiffs noted that the mayor and his chief of staff were copied on the letter advising Ingram of his promotion. Keenan claimed there was nothing unusual about that, stating that he typically copied the mayor, chief of staff, business administrator, chief city clerk, and personnel officer about promotion decisions, as a means of notifying them of the promotion ceremony. And, Keenan stated that neither the mayor nor anyone in the City administration told him they wanted Ingram promoted.

B.
DeBonis joined the force in 1973. He was promoted to sergeant in 1990. In the Summer of 1998, he filed an application for retirement, which was approved by the Department of the Treasury, Division of Pensions and Benefits, with an effective retirement date of November 1, 1998.
The September 21, 1998 letter from the Division of Pensions and Benefits approving DeBonis' retirement application stated:
IN ACCORDANCE WITH LAW, YOU HAVE UNTIL THIRTY DAYS AFTER (A) THE EFFECTIVE DATE OF YOUR RETIREMENT, OR (B) THE DATE YOUR RETIREMENT WAS APPROVED BY THE BOARD OF TRUSTEES, WHICHEVER IS THE LATER DATE, TO MAKE ANY CHANGES TO YOUR RETIREMENT.
Similarly, the Police and Firemen's Retirement System handbook stated:
Approximately 1 Month Before Retirement
Your retirement will be presented to the Board of Trustees for approval. You will receive a Board approval letter and will have 30 days from the Board approval date or your effective retirement date (whichever is later) to cancel your retirement. . . .
By memorandum dated November 27, 1998, DeBonis wrote to police chief Ernest Williams and requested nullification of his retirement and reinstatement to the police department. DeBonis' position had already been filled. He specifically requested permission to fill the vacancy created by Girman's suspension. Keenan had already begun interviewing the three tied candidates for that position.
Keenan lacked experience in situations such as this. Initially, Keenan's representative instructed DeBonis to report for work on December 1, 1998. However, upon further investigation, which included consultation with the City personnel director and review of applicable statutes and regulations, Keenan concluded that once DeBonis' retirement papers had been processed and his position filled, he could only become reemployed by having his name placed on a reemployment list, and that the current promotional list would take precedence over a reemployment list. On the morning of December 1, 1998, Keenan telephoned DeBonis and informed him of this position. Believing he had no choice in the matter, DeBonis wrote to the *908 chief on December 1, 1998 stating that he did not wish to be reinstated and wished to continue his retirement.
In this litigation, DeBonis made two claims. He claimed he was wrongfully denied his right to return to the position of sergeant within thirty days of his retirement. He further claimed he was denied the vacant sergeant position based upon his race. In that regard, he contended that, based upon his prior service as a sergeant, his credentials were superior to those of Ingram, Klawitter and Dehart. He thus claimed that the City rejected the cancellation of his retirement in order to promote Ingram.

II
We first consider the City's appeal from the partial summary judgment entered in favor of DeBonis on his claim that he was wrongfully denied the right to cancel his retirement within thirty days of its effective date before he began collecting his pension. The motion judge concluded that DeBonis had properly canceled his application for retirement by submitting his November 27, 1998 letter to the chief and that, under N.J.A.C. 17:4-6.3(a), DeBonis was entitled to return to his sergeant position. The judge concluded that because another sergeant position was open at the time DeBonis requested reinstatement, the City could not demonstrate that it detrimentally relied upon DeBonis' retirement merely because it had already filled DeBonis' sergeant position before he rescinded.
In reaching these conclusions, the judge relied upon North Arlington PBA # 95 v. Borough of North Arlington, 221 N.J.Super. 520, 521, 535 A.2d 29 (App. Div.1987), in which we considered the validity of a municipal ordinance, which provided that
once a police officer of any rank has elected to take his retirement and to accept any of the benefits, including but not limited to, terminal leave, accumulated sicktime, vacation time or personal days, then and in that event he cannot change his mind and seek to return to active duty nor can he withdraw his application for retirement.
We concluded that the ordinance had no impact on employee pensions. Id. at 523, 535 A.2d 29. Instead, it addressed "the matter of the orderly process of retirement of [municipal] employees and the recruitment and employment of new employees." Ibid. We further stated that the ordinance
allow[ed] the municipality to put its house in order and pursue the employment of new personnel in order to protect the public without having that process interrupted or interfered with by a change of mind of the retiring officer. It is imperative that all municipalities, both large and small, not be understaffed and that they move rapidly, in the public interest, to replenish the ranks of their police forces. . . . [N]o municipality should be compelled to wait for months or years to bring its force up to the necessary strength.
[Id. at 523-24, 535 A.2d 29.]
We acknowledged that police officers were entitled to cancel their retirement applications before their retirement benefits became due and payable. Id. at 524, 535 A.2d 29. However, the ordinance did not interfere with that right. It merely provided that officers who had elected to retire could not resume their employment. Ibid.
The motion judge found his decision consistent with our unpublished decision in Marino v. Edison Twp., No. A-5508-83T7, (App.Div. March 18, 1985), which we discussed in North Arlington. In that case a police officer was permitted to cancel his *909 retirement and resume employment. Marino, supra, slip op. at 4. Marino was distinguishable from North Arlington because, in that case, there was no evidence that the police officer had acted in bad faith, that the municipality had detrimentally relied upon the officer's conduct, or that a municipal ordinance existed that prohibited reemployment. North Arlington, supra, 221 N.J.Super. at 524-25, 535 A.2d 29. The ordinance in North Arlington was apparently adopted in response to the Marino decision. Id. at 525.
Finally, the motion judge also relied on an unpublished Law Division opinion issued after North Arlington, in which the court held that in the absence of an ordinance prohibiting reinstatement after a police officer canceled an intended retirement, the municipality lacked discretion to reject the cancellation and the officer was entitled to reinstatement. See Albro v. Borough of Paramus, No. BER-L-1537-96 (Law Div. April 8, 1999).
The City contends that, although under pension regulations DeBonis was entitled to cancel his retirement within thirty days of its effective date, he was not entitled to immediately return to his former position. Instead, the City argues that under regulations promulgated by the Department of Personnel, DeBonis could have his name placed on a reemployment list, and his reemployment would be governed by civil service list priorities. We agree with the City.
We first note our standard of review. Because the issue involves the interpretation of statutes and regulations, it is a purely legal issue, which we consider de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
"[T]he Legislature has enacted a comprehensive statutory scheme governing the pension rights of police and fire persons." North Arlington, supra, 221 N.J.Super. at 522, 535 A.2d 29. That scheme is found at N.J.S.A. 43:16A-1 to -68, under which, pursuant to N.J.S.A. 43:16A-2, the Police and Firemen's Retirement System (PFRS) was established in the Division of Pensions of the Department of the Treasury. In turn, pursuant to N.J.S.A. 43:16A-13(7), the Board of Trustees of the PFRS adopted regulations applicable to the PFRS. See N.J.A.C. 17:4-1.1 to -7.3. In particular, retirements under the PFRS are governed by N.J.A.C. 17:4-6.1 to -6.18.
As specifically relates to this case, N.J.A.C. 17:4-6.3(a) provides that:
Except as provided by N.J.A.C. 17:4-6.7 [which addresses disability retirements], a member shall have the right to withdraw, cancel or change an application for retirement at any time before the member's retirement allowance becomes due and payable by sending a written request signed by the member. Thereafter, the retirement shall stand as approved by the Board.
And, N.J.A.C. 17:4-6.2 provides:
A member's retirement allowance shall not become due and payable until 30 days after the date the Board approved the application for retirement or one month after the date of the retirement, whichever is later.
Thus, under these two regulatory provisions, it is clear that DeBonis was entitled to cancel his retirement on November 27, 1998, less than thirty days after his retirement date and before his retirement allowance had become due and payable. The contents of the September 21, 1998 letter to DeBonis from the Division of Pensions and Benefits and the statement in the Police and Firemen's Retirement System Handbook were consistent with these regulations.
*910 As we discussed in North Arlington, supra, 221 N.J.Super. at 523-24, 535 A.2d 29, however, the statutory and regulatory schemes governing retirements under PFRS are silent regarding the right to reinstatement or reemployment if an employee cancels his or her retirement. Thus, it would not be inconsistent with the statutory or regulatory scheme for the state or a municipality to limit a police officer's reemployment rights in the context of a canceled retirement.
In this case, the City contends that the State has effectuated such a limitation through the Civil Service Act, N.J.S.A. 11A:1-1 to 11A:12-6, and the regulations adopted by the Department of Personnel pursuant to that Act, N.J.A.C. 4A, which comprehensively regulate the employment and reemployment rights of civil service employees such as DeBonis.
The purpose of the Civil Service Act "is to ensure efficient public service for state, county, and municipal government." Commc'ns Workers of Am. v. N.J. Dep't of Pers., 154 N.J. 121, 126, 711 A.2d 890 (1998); see also N.J.S.A. 11A:1-2 (declaration of policy). And, N.J.A.C. 4A:1-1.1 provides that the purpose of the Department of Personnel's implementing regulations "is to establish a personnel system that provides a fair balance between managerial needs and employee protections for the effective delivery of public services consistent with Title 11A, New Jersey Statutes."
Of particular importance here is N.J.A.C. 4A:4-7.10 (emphasis added), which directly addresses the reemployment rights of retirees, and provides:
(a) A permanent employee who has resigned in good standing, retired or voluntarily demoted, may request consideration for reemployment by indicating availability to his or her appointing authority.

(b) Upon recommendation of the appointing authority that such reemployment is in the best interest of the service, the Department of Personnel shall place the employee's name on a reemployment list. A regular reemployment list shall be subject to certification to all appointing authorities in a jurisdiction.
(c) Police and fire reemployment lists shall have unlimited durations. Regular reemployment lists for all other titles shall have durations of three years from the date of resignation, retirement or voluntary demotion, unless the list is extended pursuant to N.J.A.C. 4A:4-3.3(a)1.
1. Requests for reemployment must be submitted within the duration of the applicable list.
(d) Seniority commences as of the date of regular reemployment.
The Civil Service Act and implementing regulations also address the issue of the priority of employment eligibility lists. Specifically, N.J.S.A. 11A:4-12 (emphasis added) provides the following order of priority:
a. Special reemployment when the available position is in the department from which the eligible was laid off or demoted in lieu of layoff;
b. Promotional;

c. Special reemployment when the available position is located in a department other than that from which the eligible was laid off or demoted;
d. Regular reemployment, police reemployment or fire reemployment; and
e. Open competitive.
Accord N.J.A.C. 4A:4-3.7.
The Civil Service Act defines the eligibility lists as follows:

*911 The commissioner may establish the following types of eligible lists:
a. Open competitive, which shall include all qualified eligibles without regard to whether they are currently employed by the State or a political subdivision;
b. Promotional, which shall include qualified permanent eligibles;
c. Regular reemployment, which shall include former permanent employees who resigned in good standing and whose reemployment is certified by the appointing authority as in the best interest of the service. The name of any such employee shall not remain on a reemployment list for more than three years from the date of resignation, unless otherwise extended pursuant to N.J.S. 11A:4-6;
d. Police or fire reemployment, which shall include former permanent uniformed members of a police or fire department who have resigned in good standing and whose reemployment is certified by the appointing authority as in the best interest of the service; and
e. Special reemployment, which shall include permanent employees laid off or demoted in lieu of layoff from permanent titles.
[N.J.S.A. 11A:4-9 (emphasis added).]
Accord N.J.A.C. 4A:4-3.1.
Finally, the Civil Service Act provides that "[a]ny law or statute which is inconsistent with any of the provisions of this title are to the extent of the inconsistency hereby superseded," except that the Act does not expand or diminish any collective negotiation rights under the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 to -39. N.J.S.A. 11A:12-1.
Thus, under these statutory and regulatory provisions, the City argues that Keenan correctly informed DeBonis that he was entitled to cancel his retirement, but that did not mean that he was entitled to immediate reinstatement to his former position. Instead, under N.J.A.C. 4A:4-7.10, DeBonis was required to ask that his name be placed on a police reemployment list, and his reemployment would be governed by the order of priority established by law, with the promotional list for sergeants having priority over the police reemployment list. See N.J.S.A. 11A:4-12; N.J.A.C. 4A:4-3.7.
The issue raised by the City in this appeal was not addressed in North Arlington.[4] Therefore, North Arlington does not control the disposition of the question presented here.
In general, courts strive to reconcile and harmonize different statutes and avoid finding a direct and irreconcilable conflict between them. Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14, 878 A.2d 829 (2005); In re Gray-Sadler, 164 N.J. 468, 485, 753 A.2d 1101 (2000). Furthermore, regulations carry a presumption of reasonableness. Schwerman Trucking Co. v. Dep't of Envtl. Prot., 125 N.J.Super. 14, 18, 308 A.2d 353 (App.Div.1973). Thus, the judiciary's capacity to review administrative regulations is limited. Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (1985). The judiciary's role consists of three inquiries:
(1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is *912 substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
[Ibid.]
Courts should give deference to an agency's interpretation and implementation of its regulations enforcing the statute or statutes for which it is responsible. Saint Peter's Univ. Hosp., supra, 185 N.J. at 13, 878 A.2d 829; Nelson v. Bd. of Educ. of Old Bridge Tp., 148 N.J. 358, 364, 689 A.2d 1342 (1997); N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot., 241 N.J.Super. 145, 165, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379, 380 (1990); In re Boardwalk Regency Corp. for a Casino License, 180 N.J.Super. 324, 333-34, 434 A.2d 1111 (App.Div.1981), modified, 90 N.J. 361, 447 A.2d 1335 (1982).
The Department of Personnel's interpretation is set forth in the regulations cited above, particularly N.J.A.C. 4A:4-7.10, authorizing placement on a reemployment list of a retiring employee who requests consideration for reemployment. We conclude that this interpretation reconciles the statutory and regulatory schemes of the Department of Personnel and the Division of Pensions and Benefits. We also conclude that the interpretation is consistent with our decision in North Arlington, supra, 221 N.J.Super. at 523-24, 535 A.2d 29, where we emphasized the difference between retirement rights and reemployment rights, and concluded that there was nothing inconsistent with permitting the cancellation of a retirement while simultaneously limiting reemployment rights.
Therefore although DeBonis was entitled to cancel his retirement, his reemployment rights were governed by the Civil Service Act and the implementing regulations of the Department of Personnel. The Law Division erred in concluding otherwise, and we reverse the partial summary judgment in DeBonis' favor on that claim. The liability issue should have been decided in favor of the City and should not have gone to trial. Accordingly, the final judgment in favor of DeBonis is reversed.

III
We next address the City's argument that the jury's verdict in favor of Klawitter was against the weight of the evidence. The City argues that the evidence was insufficient to support the jury's conclusion that race was a determinative factor in the City's decision not to promote Klawitter and that the City is the unusual employer that discriminates against the majority. The City also argues that the $79,538 emotional distress damage award was excessive.
In denying the City's new trial motion, the trial judge found that there was more than sufficient evidence to support the jury's findings. With respect to the liability issues, the judge recounted some of the evidence this way:
Some of the evidence that was presented indicated the following. Director Keenan was under pressure to promote Ingram, because he was African American. Mayor Palmer wanted Ingram promoted to the sergeant's position, because he was African American. The Mayor communicated his desire that Ingram be promoted to Public Safety Director Keenan. That by referendum the Mayor had also abolished the promotional system for Chief within the Trenton Police Department and replaced that *913 with the appointment of a Public Safety Director charged with the oversight of the Police Department. In doing so this last action created the appointed position of Police Director, and that was done with the intention that the Director would serve at the pleasure of the Mayor.
This referendum in effect allowed the Mayor to bypass one of the three Deputy Director  Deputy Chiefs, all of whom were white, and to promote the appointment of an outside African American candidate. Furthermore, the evidence shows that Ingram was chosen for the position of sergeant before the candidate interviews for the position, wherever [sic] conducted, that is before the interviews with Klawitter and DeBonis, and that contrary to the defendant's factual assertions and arguments in the brief, Klawitter was indeed qualified for the sergeant's position.
With respect to the damages verdict, relying on Tarr v. Ciasulli, 181 N.J. 70, 853 A.2d 921 (2004), and Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 276 A.2d 861 (1971), the judge found the evidence sufficient to support the award. He said:
Here the jury found that plaintiff Klawitter was the victim of discrimination. It heard direct testimony from Klawitter about how she felt crushed and was devastated by the City of Trenton's actions. The Court finds that Klawitter's emotional distress complaint is of the nature contemplated by the Court in Tarr and was within the sole discretion of the jury as the fact finder to quantify those damages in a monetary award. The award of emotional distress damages to the plaintiff does not shock the consci[ence], and it's not so grossly excessive as to [infect] the entire result and to visit a manifest injustice upon the defendant.
We may not reverse the denial of a motion for a new trial because the jury verdict was against the weight of the evidence "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; Dolson v. Anastasia, 55 N.J. 2, 6-7, 258 A.2d 706 (1969). The court may not substitute its judgment for that of the jury. Schaefer v. Cedar Fair, L.P., 348 N.J.Super. 223, 240, 791 A.2d 1056 (App.Div.2002). Rather, the court should canvass the record to determine if "reasonable minds might accept the evidence as adequate to support the jury verdict." Borngesser v. Jersey Shore Med. Ctr., 340 N.J.Super. 369, 377, 774 A.2d 615 (App.Div.2001).
The court's review
is not limited to a determination of whether the trial court committed an abuse of discretion but, rather, [the court] must make [its] own determination as to whether or not there was a miscarriage of justice, deferring to the trial judge only with respect to those intangible aspects of the case not transmitted by the written record-such as witness credibility, demeanor and the feel of the case.
[Id. at 377-78, 774 A.2d 615.]
The standard for reversal on weight of the evidence grounds is high. "Only when upon examination the verdict is found to be so contrary to the weight of the evidence as to give rise to the inescapable conclusion that it is the result of mistake, passion, prejudice or partiality, may it be disturbed." Aiello v. Myzie, 88 N.J.Super. 187, 194, 211 A.2d 380 (App. Div.), certif. denied, 45 N.J. 594, 214 A.2d 30 (1965).
We are satisfied that the trial record supports the jury's verdict. The jury was *914 properly instructed on the applicable law on liability and damages, and the City does not argue otherwise. The City's weight of the evidence arguments ask that we reject the jury's findings in support of the City's alternative interpretation of the evidence and that we accept a theory of the case contrary to what the City advanced at trial and that is not evidentially supported. The law does not permit such a result. The record does not suggest a miscarriage of justice under the law, and we affirm the denial of the City's motion for a new trial.

A.
With respect to liability, the City urges us to conclude that Ingram was more qualified for promotion than Klawitter and Dehart and because Ingram was the correct choice for promotion to sergeant, regardless of race, any consideration of Ingram's race was harmless. This argument would require that we engage in fact-finding and credibility determinations in order to reach a result that is contrary to the jury's verdict, although, viewed in the light most favorable to Klawitter, the evidentiary record supports that verdict.
The record reflects that Ingram, Klawitter, and Dehart were equally ranked on the promotion list. Any of the three candidates would have been acceptable for promotion, and there were no standards for selecting between the three. Keenan testified to his selection criteria, and his belief that Ingram was the most qualified. However, the jury could have reasonably concluded from the evidence that Keenan's purported selection process was a sham, infected by the Mayor's racial preferences, or Keenan's belief as to the Mayor's racial preferences, and that Keenan intended to promote the African-American candidate regardless of merit. The jury resolved this credibility contest in favor of Klawitter.
The jury was instructed that if it found "that the City of Trenton would have made the same decision not to promote Officer Klawitter regardless of her race, then you must find for the City of Trenton." The jury declined to make that factual finding. The record supports a conclusion that race was a determinative factor in the promotion of Ingram, namely that among three equally qualified candidates the ultimate decision was race-based. Although the evidence could have also supported a contrary conclusion, this was the conclusion reached by the jury. See Estate of Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 468, 734 A.2d 778 (1999) ("The fact that the evidence may also support a different outcome does not render the jury's verdict irrational or against the weight of the evidence.") Accordingly, this argument does not provide a basis for reversing the judgment in favor of Klawitter. See, e.g., Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207, 723 A.2d 944 (1999) (to succeed on an LAD claim, a plaintiff must show that the prohibited consideration had a determinative influence on the outcome of the decision-making process); Greenberg v. Camden County Vocational & Technical Sch., 310 N.J.Super. 189, 198, 708 A.2d 460 (App.Div.1998) (same).
Similarly, there is no reason to reject the jury's finding that the City was the unusual employer that discriminates against the majority. The record supports this aspect of the verdict. The testimony of Klawitter, the police chief, and the mayor suggested that, in general, the City had a "reason or inclination" to discriminate against Caucasian police officers in favor of minority officers, and specifically had an agenda to promote Ingram based upon his race. Bergen Commercial Bank, supra, 157 N.J. at 221, 723 A.2d 944. The jury was free to accept this testimony and it *915 provided a sufficient basis to support the jury's finding.
The City attempts to recharacterize this aspect of the evidence, claiming that the mayor had only undefined and open-ended goals of encouraging diversity and promoting minorities within the police force. The City claims that these goals are laudable and consistent with the LAD, which encourages diversity and condones the use of minority racial preferences. Thus, the City argues that it could properly use race as a "plus" factor. The problem with this argument is that the City never said it used race as a plus factor. Indeed, it urged the jury to find that race was not a factor in any respect.
To be sure, the case law cited by the City identifies the encouragement of racial diversity as a legitimate and important societal goal, and, under carefully controlled circumstances, affirms the use of racial considerations as a plus factor in school districting and student enrollment decisions, and public employment decisions. See, e.g., In re Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. from the Passaic County Manchester Reg'l High Sch. Dist., 181 N.J. 161, 176-86, 854 A.2d 327 (2004) (extolling the virtues of racially diverse schools and requiring considerations of racial and ethnic diversity in the context of school districting decisions); Wachstein v. Slocum, 265 N.J.Super. 6, 13-19, 625 A.2d 527 (App.Div.) (finding nothing invidious about the State Public Defender's statement that it was undesirable for all nineteen supervising public defenders to be Caucasian males, and the expressed goal of increasing the number of minorities and women in management positions, where there was no evidence that the specific employment decision about which the plaintiff complained was based upon race), certif. denied, 134 N.J. 563, 636 A.2d 521 (1993) (emphasis added); Jersey City Educ. Ass'n, Inc. v. Bd. of Educ. of Jersey City, 218 N.J.Super. 177, 194, 527 A.2d 84 (App.Div.) (implementation of a valid affirmative action plan did not violate anti-discrimination provision of the collective negotiation agreement or the LAD), certif. denied, 109 N.J. 506, 537 A.2d 1295 (1987).
The use of race as a plus factor is a useful and legitimate tool, when used as part of an overall affirmative action plan to rectify racial imbalances. We need not pass here upon the degree of formality and specificity that such a plan must contain. It is apparent, however, that such a plan should contain as its premise a finding of racial imbalance and express the basis for that finding, set forth a goal for remediating the imbalance, and prescribe some form of standards by which the goal will be achieved. Absent at least those basic ingredients, an employer would have the ability to invoke the purported "plan" in some employment decisions but not in others. This, of course, would constitute arbitrary action and would be inimical to the salutary purposes underlying affirmative action plans.
In addition to the New Jersey authorities we have cited, our conclusion that the adoption of a bona fide affirmative action plan is a prerequisite to the use of race as a plus factor is bolstered by a review of the federal jurisprudence on this subject. The New Jersey Supreme Court typically looks to federal cases involving analogous anti-discrimination provisions in interpreting state anti-discrimination laws. See Bergen Commercial Bank, supra, 157 N.J. at 200, 723 A.2d 944 ("To the extent the federal standards are useful and fair, they will be applied in the interest of achieving a degree of uniformity in the discrimination laws.") (internal quotations omitted); Shaner v. Horizon Bancorp., 116 N.J. 433, *916 437, 561 A.2d 1130 (1989) ("[The LAD] standards have been influenced markedly by the experience derived from litigation under federal anti-discrimination statutes.").
Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or nationality." Taxman v. Bd. of Educ. of Piscataway, 91 F.3d 1547, 1553 n. 6 (3d Cir.1996) (quoting 42 U.S.C.A. § 2000e-2(a)(1)). It was enacted to further two primary goals: "to end discrimination on the basis of race, color, religion, sex or national origin, . . . and to remedy the segregation and under-representation of minorities that discrimination has caused in our Nation's work force." Id. at 1557.
Initially, the United States Supreme Court interpreted Title VII as "absolutely prohibiting discrimination in employment, neither requiring nor permitting any preference for any group." Id. at 1553. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279-80, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493, 500 (1976). During this time, the LAD was similarly interpreted to prohibit any form of racial consideration when making employment decisions. See Lige v. Town of Montclair, 134 N.J.Super. 277, 281-82, 340 A.2d 660 (App.Div.1975), aff'd, 72 N.J. 5, 367 A.2d 833 (1976).
In 1979, however, the United States Supreme Court in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), determined that "Title VII's prohibition against racial discrimination is not violated by affirmative action plans which first, `have purposes that mirror those of the statute' and second, do not `unnecessarily trammel the interests of the [non-minority] employees.'" Taxman, supra, 91 F.3d at 1550 (quoting Weber, supra, 443 U.S. at 208, 99 S.Ct. at 2730, 61 L.Ed.2d at 492). The court explained, "It is only because Title VII was written to eradicate not only discrimination per se but the consequences of prior discrimination as well, that racial preferences in the form of affirmative action can co-exist with the Act's antidiscrimination mandate." Ibid. In Weber, supra, 443 U.S. at 208-09, 99 S.Ct. at 2729-30, 61 L.Ed.2d at 492, the Court approved the use of a collectively bargained affirmative action plan designed to effectuate minority admissions to a training program. The Court explained that the affirmative action plan furthered the purpose of Title VII, which was to "eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." Id. at 204, 99 S.Ct. at 2728, 61 L.Ed.2d at 489.
Subsequent federal cases followed suit, permitting the use of race-conscious decision making in educational admissions and in employment decisions, if based on an established affirmative action plan and if race is used only as a "plus factor in an overall process." See, e.g., Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (approving the use of a flexible, non-mechanical law school admissions policy in which race was used as a "plus" factor with the goal of achieving student body diversity); Johnson v. Transp. Agency, Santa Clara County, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (approving the use of an affirmative action plan that represented a moderate, flexible, case-by-case approach, designed to achieve gradual improvement in the hiring, training, and promotion of minorities and women in all major job classifications where they were underrepresented); Petit v. City of Chicago, 352 F.3d 1111 (7th Cir.2003) (approving promotions of minority *917 police officers based upon affirmative action plan), cert. denied, 541 U.S. 1074, 124 S.Ct. 2426, 158 L.Ed.2d 984 (2004). Cf. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, ___ U.S. ___, 127 S.Ct. 2738, ___ L.Ed.2d ___ (2007) (allocating children to different public schools based solely on their race violates the Fourteenth Amendment's equal protection guarantee).
In LAD decisions, New Jersey courts have followed this trend. In Jersey City Education Association Inc. v. Board of Education of Jersey City, 218 N.J.Super. 177, 194, 527 A.2d 84 (App.Div.), certif. denied, 109 N.J. 506, 537 A.2d 1295 (1987), we adopted the United States Supreme Court's decision in Johnson by holding that "implementation of a valid affirmative action plan is not the impermissible discrimination contemplated in N.J.S.A. 10:5-12." The Education Association argued in that case that certain promotions were made in violation of its Collective Negotiation Agreement, which required all vacancies to be filled "without regard to race, age, creed, color, religion, nationality, sex or marital status." Id. at 181. Specifically, the Association challenged a list that was created by the Interim Superintendent and adopted by the Board for hiring purposes. Id. at 183-84. The list categorized names "into three groups: (1) Hispanics; (2) Blacks; and (3) all others." Id. at 184.
We upheld the Board's use of the list because it identified that there was an under-representation of minorities that was disproportionate to its student body, and that it took remedial steps through an affirmative action plan to correct such disparities. Id. at 193. We focused on a notice posted by the Board, which stated that it was an "Affirmative Action Employer," and that the Board would consider "assignments to the[] promotional positions in accordance with its Affirmative Action Plan and State and Federal mandates." Id. at 190. We concluded that it was "therefore clear beyond debate that the notice stated that the Board had an affirmative action plan and that it would follow that plan in making the promotions." Ibid.
We also considered empirical evidence presented by the Board, which demonstrated an under-representation of Hispanics and Blacks proportionate to the student population in the Jersey City School District as well as a Resolution adopted by the Board, which found an "under-representation of minorities and females and resolved to attempt to hire on a fifty-fifty minority-majority basis until such time as Affirmative Action goals are met." Ibid. (Internal quotations omitted). We explained that "[t]he overwhelming evidence in the Board's appendix show[ed] that the Board was implementing its affirmative action plan when it made promotions from the [list]." Id. at 193.
The City places great reliance on our decision in Wachstein. We find that reliance misplaced. In that case, State Public Defender Alfred A. Slocum, upon accepting that position, informed the Governor that he planned to make "dramatic managerial personnel changes" and the Governor agreed. Wachstein, supra, 265 N.J.Super. at 9, 625 A.2d 527. Prominent among those changes was the status of the nineteen Regional Public Defenders, all of whom were white males. Ibid. Some worked part-time, and Slocum determined they all must work full-time. Id. at 10, 625 A.2d 527. He also believed that some should be replaced based on merit. Ibid. And, he determined that each of New Jersey's twenty-one counties should have a regional office, thus increasing the number of these positions from nineteen to twenty-one. Ibid. Five of the part-time Regional Public Defenders resigned rather *918 than work full-time, and with the two new positions, seven vacancies were thus created. Ibid. Three other Regional Public Defenders, including the plaintiff, were demoted and reassigned based on merit. Id. at 11, 625 A.2d 527. As an overall result of these actions, a total of ten vacancies were created. Ibid.
Slocum also made it known that he deemed it important that minorities and females should occupy positions as Regional Public Defenders. Id. at 11-12, 625 A.2d 527. The ten vacancies were filled with four white males, four white females, and two African-American males. Id. at 11, 625 A.2d 527.
We reversed the judgment in favor of the plaintiff, concluding that the jury's verdict, finding that he was discriminated against on the basis of race in his removal from the position of Regional Public Defender, was not supported by the evidence. Id. at 13, 625 A.2d 527.
We first noted that the plaintiff's removal was part of a sweeping new management initiative, many aspects of which had nothing to do with race or gender, and that "[v]iewed in this broader context, there is no basis in the record for a finding that plaintiff's removal from his management position was racially motivated." Id. at 14, 625 A.2d 527. We also noted that because all nineteen holders of the position were white males, the removal of any of them would of necessity constitute the removal of a white male. Id. at 14-15, 625 A.2d 527. And, we noted that with the creation of two new positions and the resignations of five part-time individuals, seven vacancies were created, without regard to race or gender. Id. at 15, 625 A.2d 527. Against this backdrop, there was no basis in the evidence for finding that the plaintiff's removal was racially motivated, because, even without his removal, a multitude of vacancies existed that could be filled by women and minorities. Ibid.
We further considered "other evidence" presented by the plaintiff, consisting of statements and correspondence by Slocum to the effect that he intended to add minorities and women to the position. Id. at 15-17, 625 A.2d 527. We concluded that this evidence could not provide a basis of discriminatory action in violation of the LAD because "Slocum could properly pursue an affirmative action policy of increasing the number of females and minorities in supervisory positions, provided that the policy was implemented in a manner consistent with discrimination laws." Id. at 17, 625 A.2d 527. As authority for that proposition, we cited N.J.S.A. 11A:7-1 to -13 (requiring all State agencies to develop, implement and administer affirmative action programs), Weber, and Johnson. Id. at 17-18, 625 A.2d 527. Thus, we based our determination on our conclusion that Slocum had established an affirmative action plan and could not be faulted for acting in accordance with it.
We note that provisions in the Civil Service Act require all State agencies to adopt and implement affirmative action programs, N.J.S.A. 11A:7-1 to -13, which is further provided for in the implementing regulation, N.J.A.C. 4A:7-2.3(b). However, there is no cognate provision in the Civil Service Act for local entities, and the applicable provision in the regulations provides that "[i]n local service, an appointing authority may establish equal employment opportunity and affirmative action programs." N.J.A.C. 4A:7-2.3(a) (emphasis added).
We hold that race can be considered in an employment decision only pursuant to and in accordance with an established affirmative action plan. Without such a plan in place, an employer would be in violation of Title VII and the LAD. As *919 we noted in Jersey City, supra, 218 N.J.Super. at 193, 527 A.2d 84, an affirmative action plan serves to assure that the employer's motive in considering race was to correct a well founded under-representation of minorities and that no unlawful purpose was at issue. See also Johnson, supra, 480 U.S. at 626, 107 S.Ct. at 1449, 94 L.Ed.2d at 627 (The existence of an affirmative action plan serves as a legitimate nondiscriminatory reason for considering race in an employment decision.).
The City failed to establish that it had adopted an affirmative action plan. The mayor's testimony that he "knew that [the City] needed more diversity, more women, more African-Americans and Latinos in upper ranks" could serve to establish the mayor's feelings on the subject, and those feelings might well be justified. And, there was some brief testimony that the City was operating under a consent decree requiring that it improve its hiring practices and promotion opportunities for minorities and women in the police and fire departments. This evidence came out only incidentally during cross-examination of two of the City's witnesses (the mayor and his chief of staff). The City did not present this evidence in its case-in-chief, never produced any consent decree, and did not argue that it considered race in promoting Ingram because of the consent decree. The mayor's feelings about the need for diversity did not constitute an affirmative action program. Nor was any such program established by the scant and very equivocal testimony regarding a consent decree. Because the document was never produced or relied upon, its terms, the timeframe it covered, and its actual existence were subject to doubt, and the jury was within its rights to discount or disregard that evidence. It was certainly not sufficient to establish the existence of an affirmative action program.
As we explained earlier, the City never contended at trial, nor did it present any evidence, that it considered race as a plus factor in selecting Ingram. It steadfastly asserted that race was not a consideration in any respect. To the extent that the City now argues on appeal that consideration of race was permissible as a plus factor, the argument lacks merit. To the extent that the City now argues that, because it had the right to consider race as a plus factor, any such consideration was harmless and should negate the sufficiency of the evidence to support the jury's finding, we also find no merit because, as we have explained, such consideration is permissible only pursuant to and in accordance with an established affirmative action plan.

B.
With respect to the damage award, we begin with the principle that courts are admonished not to set aside such awards as excessive unless the amount awarded shocks the judicial conscience. All damages evidence shall be viewed in the light most favorable to the prevailing party, with deference given to the trial court's feel of the case. Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994); Carey v. Lovett, 132 N.J. 44, 66-67, 622 A.2d 1279 (1993); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-600, 379 A.2d 225 (1977).
The City contends that Klawitter's $79,538 in emotional distress damages is not supported by the evidence. The City notes that, coincidentally, the award matches the amount Klawitter sought in lost earnings. The jury was asked to render separate damage awards for lost earnings and emotional distress. The jury awarded nothing for lost earnings.
*920 Our Supreme Court has emphasized that the standard of proof for emotional distress awards under the LAD is "far less stringent" than for a common law claim of intentional infliction of emotional distress. Tarr, supra, 181 N.J. at 82, 853 A.2d 921. "[I]n discrimination cases, which by definition involve willful conduct, the victim may recover all natural consequences of that wrongful conduct, including emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries." Ibid.; N.J.S.A. 10:5-3.
To suffer humiliation, embarrassment and indignity is by definition to suffer emotional distress. Emotional distress actually suffered in that manner by the victim of proscribed discrimination is compensable without corroborative proof, permanency of response, or other physical or psychological symptoms rendering the emotional distress severe or substantial. The quantum of compensation . . . is dependent upon . . . duration of the discriminatory conduct, its public nature, and its content and may be enhanced by such additional proofs of indicia of suffering as plaintiff may adduce. [Id. at 81, 853 A.2d 921 (quoting Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J.Super. 265, 276-77, 822 A.2d 647 (App.Div.2003)).]
Furthermore, there is no gauge for pain and suffering. Therefore, a certain amount of imprecision is acceptable as long as it appears that the damage award was not based upon speculation, passion, or prejudice. A pain and suffering award is reviewed to determine whether it is fair and reasonable. Caldwell, supra, 136 N.J. at 442, 643 A.2d 564.
Klawitter testified that she was "crushed" and "devastated" when she learned that she "didn't stand a chance" for promotion to sergeant. Moreover, the record reflects that Klawitter continued to suffer emotionally from the lasting effects of this career setback long after that day had passed. She cried on the witness stand at trial, commenting that "[her] heart [was] beating a mile a minute right now," discussing events that had occurred more than six years earlier. Considering our very limited standard of review, and deferring to the trial judge's feel of the case, we perceive no error in the jury's awarding emotional distress damages or in the amount awarded.
We are mindful that because the emotional distress award equaled the amount sought for lost wages some confusion on the jury's part might be suggested. There could be many reasons, however, that the jury chose not to award lost wages, and we will not speculate on the subject. That circumstance does not alter our conclusion that the emotional distress damage award is fair and reasonable, merely compensatory and not disproportionate to Klawitter's actual losses, and not based on passion, prejudice, or speculation. The award does not shock our judicial conscience.

IV
Finally, we consider the City's claim that the attorney's fee awarded to Klawitter was excessive. The amount awarded, $33,846.45 (including costs) was the exact amount requested. The judge's findings were limited to a conclusion that the number of hours expended and the hourly rate charged were reasonable, as were the expenses.
On appeal, the City argues that the billing records supporting the attorney's fee application reflect some entries representing services rendered solely on behalf of DeBonis. Our review of the billing records confirms the same. Obviously, those services cannot be included in a fee *921 award to Klawitter. Further, some of the services were performed on behalf of both Klawitter and DeBonis. The extent to which an award to Klawitter should be made based upon those services must be evaluated differently than with respect to services rendered exclusively for Klawitter. See, e.g., New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 185 N.J. 137, 153-55, 883 A.2d 329 (2005); Kluczyk v. Tropicana Prods., Inc., 368 N.J.Super. 479, 499-500, 847 A.2d 23 (App.Div.2004); Robb v. Ridgewood Bd. of Educ., 269 N.J.Super. 394, 404-05, 635 A.2d 586 (Ch.Div.1993).
The attorney's fee award must be reconsidered.

V
The judgment in favor of DeBonis is reversed. The judgment in favor of Klawitter for damages and prejudgment interest is affirmed, but the attorney's fee award in favor of Klawitter is vacated and remanded for reconsideration.
NOTES
[1] Because of this disposition, the City's remaining arguments pertaining to DeBonis, alleging that he failed to mitigate damages, he was not entitled to prejudgment interest, and the damage award was against the weight of the evidence, are moot, and we need not discuss them.
[2] There was actually a fifth officer with a higher ranking, but he was passed over because he was under indictment and on suspension.
[3] On the February 11, 1999 list, Klawitter ranked number 115 and she was never reached for promotion. She remained a detective at patrol level at the time of the 2005 trial. Dehart ranked number two on the February 11, 1999 list and was promoted to sergeant in April 1999. He was promoted to lieutenant in 2003.
[4] The issue was also not addressed in the unpublished Law Division decision upon which the motion judge relied.